Richard M. PARKER, et al., Plaintiffs,

v.

David S. WAKELIN, et al., Defendants.

Civ. No. 94–157–P–C.

United States District Court,
D. Maine.

April 3, 1995.

Kaighn Smith Jr., Donald F. Fontaine, Fontaine & Beal, P.A., Portland, ME, for plaintiffs.

H. Cabanne Howard, Asst. Atty. Gen., Augusta, ME, for defendants.

## MEMORANDUM AND ORDER GRANTING IN PART, AND DENYING IN PART, DEFENDANTS' MOTION TO DISMISS

GENE CARTER, Chief Judge.

Plaintiffs, the Maine Education Association ("MEA") and four classes of public school teachers as members of the Maine State Retirement System ("MSRS") brought this action seeking declaratory and injunctive relief and challenging amendments enacted by the Maine Legislature in 1993 which modify certain aspects of the MSRS ("the 1993 amendments"). P.L.1993, ch. 410, Part L, §§ 12, 13, 28, 31–37 (codified as amended at 5 M.R.S.A. §§ 17001, 17701–B, 17806, 17851, 17852). Defendants filed a Motion to Dismiss (Docket No. 11). After briefing and oral arguments by the parties, this Court concludes that the motion should be granted in part and denied in part.

To resolve Defendants' Motion to Dismiss, the Court must accept as true all factual allegations in the Complaint, construe the record in favor of Plaintiffs, and decide whether, as a matter of law, Plaintiffs could prove no set of facts which would entitle them to relief. *Snyder v. Talbot*, 836 F.Supp. 19, 22 (D.Me.1993). The facts as stated in Plaintiffs' Complaint are set forth below.

### I. FACTS

Defendant MSRS operates as a public pension trust and was established pursuant to Maine law for the purpose of providing benefits to most state employees, including public school teachers, and employees of certain "local districts" which elect to participate in the system. *See* 5 M.R.S.A. §§ 17001–18663. Membership is mandatory for all four classes of Plaintiffs here. The MSRS is considered to be a "defined benefit system," in that the precise retirement benefits provided for teachers are defined upon employment and financed by their fixed contributions to the trust administered by MSRS, combined with the contributions from the State as their employer. The contributions are determined by a set percentage of the teachers' salaries.[1] These rates are determined on the advice of the MSRS actuary.

In 1993, the anticipated appropriation necessary to cover the State's contribution to the fund was estimated to be $404,000,000. In order to lower the amount of that appropriation, legislators enacted certain amendments modifying the MSRS. P.L.1993, ch. 410, Part L (effective July 1, 1993). The particular amendments challenged in this case affected Plaintiffs in several respects: (1) raising the teachers' required contribution from 6.5% of their annual salary to 7.65%; (2) capping the salary increases that may be included in the calculation of the teachers' retirement benefits; and (3) delaying by six months the cost-of-living adjustments to the teachers' retirement benefits. P.L.1993, ch. 410, Part L §§ 13, 28, 31.

While those changes were made to all teachers' pensions, certain other modifications affected only those teachers whose right to retirement benefits had not yet "vested":[2] (1) increasing the retirement age from sixty to sixty-two years of age; (2) increasing the early retirement penalty (imposed if an employee retires after twenty-five years of service but prior to reaching age sixty-two) to loss of all retirement benefit income from 2.25% to 6% per retirement year preceding age 62; and (3) eliminating the inclusion of *per diem* payment of up to thirty days of unused sick leave or vacation pay in the calculation of "average final compensation" to determine the amount of retirement benefits to be paid. P.L.1993, ch. 410, Part L §§ 12, 35, 37.

Plaintiffs filed this action challenging the constitutionality of the 1993 amendments and seeking injunctive and declaratory relief

---

1. Until the 1993 amendments, this rate had been established as 6.5%.

2. Under the statute, teachers are not eligible to claim retirement benefits unless they have ten years or more of service or are 60 or older and have worked one year or more as of July 1, 1993. Thus, after completing either of these prerequisites, the teachers' benefits are considered to be "vested."

blocking the implementation of these amendments. This Court certified four classes of Plaintiffs, each of which set forth different claims, as discussed below.

## II. ANALYSIS

### A. The Class I Claims

This Court certified the Class I Plaintiffs as, "[a]ll non-retired public school teachers in the State of Maine who were members of the Maine State Retirement System as of June 30, 1993, and all retired teachers in the State who have retired since March 1, 1994." (Docket No. 7). These Plaintiffs seek relief under three legal theories: (1) violation of their rights under Article I, section 10 of the United States Constitution ("the Contract Clause") (Count I); (2) violation of their rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution (Count II); and (3) violation of their rights under the Equal Protection Clause of the Fourteenth Amendment (Count III). The Court will address each claim in turn.

### 1. The Contract Clause Claim (Count I)

■■■ Class I Plaintiffs allege that the 1993 amendments impair their contractual rights as members of the MSRS.[3] This Court has previously set out the requirements of a claim alleging a violation of the Contract Clause: "the threshold inquiry for this type of claim is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" *Lovell v. Peoples Heritage Sav. Bank*, 776 F.Supp. 578, 592 (D.Me.1991) (quoting *Energy Re-*

*serves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697, 704, 74 L.Ed.2d 569 (1983)). Therefore, there are three components to such an inquiry: "whether there is a contractual relationship, whether a change in law impairs the contractual relationship, and whether the impairment is substantial." *Lovell v. One Bancorp*, 818 F.Supp. 412, 422 (D.Me.1993) (quoting *General Motors Corp. v. Romein*, 503 U.S. 181, 186–88, 112 S.Ct. 1105, 1109–10, 117 L.Ed.2d 328, 337 (1992)).

■■■ Plaintiffs argue that their Complaint satisfies the first component, the existence of a contractual relationship, not by way of an express contract, but through the operation of the overall MSRS statutory scheme. A significant consideration at this stage of the analysis is of what persuasive effect, if any, is the opinion of the Maine Supreme Judicial Court, sitting as the Law Court, in *Spiller v. State*, 627 A.2d 513 (Me.1993). That case, in which Plaintiffs here appeared on appeal as *amicus curiae*, was a challenge by members of the Maine State Employees Association, who are also mandatory members of MSRS, against the amendments to the MSRS statutory scheme enacted in 1991.[4] The *Spiller* plaintiffs sought relief from the amendments for a purported violation of the Contract Clause. The Maine Superior Court interpreted the MSRS statute to provide the plaintiffs with contractual rights and further found that, although reducing the state's deficit was a legitimate public purpose, these contract rights had been substantially impaired as a result of the 1991 amendments.

---

3. According to the prayer for relief in Plaintiff's Second Amended Complaint (Docket No. 23), the Class I Plaintiffs ask this Court to enjoin sections 12, 13, 28, and 31–37 of the 1993 amendments. The counts brought by the other Classes, however, do not seek relief from section 13 (capping the salary increases included in calculation of benefits) and section 31 (delaying the cost-of-living adjustments).

4. The 1991 changes excluded from the definition of "earnable compensation" payment received for unused leave for sickness or vacation; raising the minimum age for retirement with full benefits from 60 to 62 years of age; and increasing the penalty for retirement before the minimum age. The aim of the amendments, which were

enacted as the State was facing a serious budget shortfall, was to substantially reduce the annual contribution required from the State. *Spiller v. State*, 627 A.2d 513, 514–15 (Me.1993).

These changes affected only those employees with fewer than seven years of "creditable service," thereby reaching only "nonvested" employees. The amendments in *Spiller* are identical to those challenged in the present action by the Class II Plaintiffs, except that the 1993 amendments extended the 1991 changes to reach all nonvested employees (*i.e.*, all employees with fewer than ten years of creditable service) rather than only those nonvested employees with less than seven years of creditable service. *See* discussion *infra* at 1140.

The Law Court reversed the Superior Court's holding. The Law Court made a preliminary observation: "Under time honored rules of construction, a statute will not be presumed to create contractual rights, binding future legislatures, unless the intent to do so is clearly stated." *Id.* at 515 (citing *National R.R. Passenger Corp. v. Atchison, T. & S.F.R. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432 (1985)). In accordance with that principle, the Law Court concluded:

> In the retirement statute being construed here, not only is there no clear indication of a legislative intent to create immutable contractual rights for all state employees, the statutory language compels a contrary conclusion. Sections 17050 and 17051, relied on by the plaintiffs, do not create contractual rights. Rather, they state general policy principles, none of which are changed by the enactment of the [1991 amendments].

*Spiller,* 627 A.2d at 516. The court also held that section 17801 of the statute precluded a finding of an intent to create contractual rights through the enactment of MSRS. The court reasoned that the implication of that section, which provides that future legislation may not reduce the benefits of any members that were actually due at the time the reductions go into effect,[5] was that the legislature reserved the power to modify prospective retirement benefits for employees to whom benefits were *not* due. *Id.* The court also found that there was no due process violation in the enactment of the 1991 amendments. *Id.* at 517 n. 12.

 Defendants argue that the *Spiller* decision is "dispositive" of a substantial portion of this action. This Court disagrees. It is for this Court to determine what effect and weight is to be given to the Law Court's conclusions in *Spiller.* The mere fact that the holding in *Spiller* is directly contrary to Plaintiffs' position here is not a sufficient basis in itself to grant full deference to the Law Court's decision and dismiss Plaintiff's claim. Rather, this Court will examine the authority and record that served as the basis for the Law Court's conclusion to determine whether it can properly serve as persuasive authority for the issues raised in this motion.

Plaintiffs contend that the Law Court's decision should not bind this Court and attempt to distinguish the *Spiller* decision on several bases. For example, Plaintiffs point out that the classes certified here include not only employees whose benefits have not yet vested (like the *Spiller* plaintiffs), but also include all teachers who are members of the MSRS since the 1993 amendments affected, *inter alia,* the annual contribution rate of all teachers. Plaintiffs also argue that the issue of whether contract rights were created was never briefed, argued, or otherwise presented to the Law Court.

 This Court, for several reasons, is reluctant to adopt the holding in *Spiller* and dismiss this claim. As a preliminary matter, it should be noted that this Court has previously acknowledged that " '[t]he question whether a contract was made is a federal question for purposes of Contract Clause analysis.' " *Lovell v. One Bancorp,* 818 F.Supp. at 422 (quoting *General Motors Corp. v. Romein,* 503 U.S. 181, 186–88, 112 S.Ct. 1105, 1109–10, 117 L.Ed.2d 328, 337 (1992)). Although the determination of whether a state law creates a contractual obligation is a matter of federal law, the conclusions of a state high court are nonetheless due appropriate deference. *See Pineman v. Fallon,* 662 F.Supp. 1311 (D.Conn. 1987), *aff'd* 842 F.2d 598 (2d Cir.1988).[6]

---

**5.** That section provides, in pertinent part:

> No amendment to this Part may cause any reduction in the amount of benefits which would be due to a member ... on the date immediately preceding the effective date of the amendment.

5 M.R.S.A. § 17801.

**6.** Judge Cabranes of the United States District Court for the District of Connecticut was faced with an issue similar to that presented here; that is, determining the proper weight to afford a state court's determination of the creation of a contract by the enactment of state pension fund. He observed:

> Whether [a state] has bound itself by contract is a question primarily of state law, to which this court must "accord respectful consideration and great weight," but "in order that the constitutional mandate may not become dead letter, we are bound to decide for ourselves whether a contract was made, what are its

Under the case law developed by the United States Supreme Court, a narrow test is employed to determine if a state statute may be construed to create enforceable contract rights. The Supreme Court has instructed lower courts to find "clear indication that the legislature intends to bind itself contractually," before concluding that the presumption against the creation of contractual rights by statute has been defeated. *National R.R. Passenger Corp. v. Atchison, T. & S.F.R. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432 (1985). A statute may create contractual obligations, binding the state, only when "the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State[ ]." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92 (1977). While it is clear from the Supreme Court cases that the "cardinal inquiry is as to the terms of the statute," *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 104, 58 S.Ct. 443, 448, 82 L.Ed. 685 (1938), the analysis used to determine the existence of legislative intent also involves the examination of the circumstances of the statute's passage. *See, e.g., Atchison,* 470 U.S. at 468–69, 105 S.Ct. at 1453.[7] The Court of Appeals for the First Circuit also requires courts to examine both the language and circumstances of a statute's passage to determine the legislative intent. *Hoffman v. Warwick,* 909 F.2d 608, 614 (1st Cir.1990) ("The language and circumstances of [the

Rhode Island statute in question] do not suggest a legislative intent to create private contractual rights.").

In *Spiller,* the Law Court concluded, from a strictly facial review of the statute's language, that no contractual rights were created through the enactment of the MSRS legislation. It appears that this conclusion was reached upon a review of the sparse stipulated record and without any consideration of the circumstances of the 1991 amendments' passage. Plaintiffs seek an opportunity to present evidence, such as legislative committee reports, actuarial evaluations, and Attorney General opinions, to establish the existence of a contract. Defendants argue that these documents are improper for this Court's consideration in its analysis of legislative intent, although, at oral argument, Defendants conceded that it was appropriate for this Court to consider legislative history.

The Supreme Court has instructed courts to look beyond the express language of a statute to determine legislative intent to bind the state contractually. The Law Court's analysis in *Spiller,* however, required nothing short of an express statement of contractual intent *within the language of the statute itself.* The standard articulated by the Law Court goes beyond those established in federal law, requiring consideration of what meaning can be drawn from the legislative history of the statute's enactment in addition to the express provisions of the statute.[8]

---

terms and conditions, and whether the state has, by later legislation, impaired its obligation." *Pineman v. Fallon,* 662 F.Supp. 1311, 1315 (D.Conn.1987) (quoting *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685 (1938)).

In contrast, the United States Court of Appeals for the Ninth Circuit held that "[f]ederal law, not [state] law, controls whether the state statutes at issue create contractual rights protected by the contract clause." *Nevada Employees Assoc., Inc. v. Keating,* 903 F.2d 1223, 1227 (9th Cir.1990). Although it reached the same conclusion as the Nevada Supreme Court regarding the statute at issue there, the panel did not purport to grant any deference to the state court's conclusions.

7. In *Atchison,* the Supreme Court observed that "the circumstances of the [Rail Passenger Service Act's] passage belie an intent to contract away governmental powers." *Atchison,* 470 U.S.

at 468, 105 S.Ct. at 1453. The Court then noted the long history of railroad regulation, the inadequacy of the "consideration" paid by the railroads for the contractual rights they sought to assert, and the legitimate expectations of the railroads, concluding that these factors "cut[ ] against any argument that the statute created binding contractual rights." *Id.* at 469, 105 S.Ct. at 1453.

8. Both parties place significant emphasis on the issue of precisely what evidence may be presented in Plaintiffs' case to demonstrate the existence of contractual rights. Defendants acknowledged during oral argument that this Court is not restricted to the language of the statute, and may consider the legislative history, when ascertaining the legislative intent. Defendants, however, reject Plaintiffs' position that this Court may also consider other evidence, such as actuarial studies, as part of its analysis. The determination of

Therefore, since *Spiller* was decided under an excessively narrow and literal standard, precluding full analysis of the potential existence of a contract, its persuasive authority is greatly diminished.[9] This Court concludes that an analysis of the legislative intent of the MSRS statutory scheme requires a record that is more developed than that presented at this initial stage of the proceedings and that considered by the Law Court in *Spiller*. Accordingly, Defendants' motion to dismiss this count will be denied.

### 2. The Due Process Claim (Count II)

■ Class I Plaintiffs also seek relief for the purported violation of their rights under the Due Process Clause of the United States Constitution. The Law Court has held that state employees' "legitimate retirement expectations ... may constitute property rights that the legislature cannot deprive them of without due process of law," *Spiller*, 627 A.2d at 517 n. 12, and that "retirement benefits are more than a gratuity to be granted or withheld arbitrarily at the whim of the sovereign state." *Id.* at 517. This Court has held, "To establish a substantive due process claim, Plaintiffs must show that the ... statute is 'arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt.'" *Lovell v. One Bancorp*, 818 F.Supp. at 423 (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 11, 108 S.Ct. 849, 857, 99 L.Ed.2d 1 (1988)).

Plaintiffs argue that, aside from contractual considerations, the MSRS statutory scheme created property interests within the meaning of the Fourteenth Amendment Due Process Clause. The due process violation, Plaintiffs contend, arose from the arbitrary and capricious manner in which their retirement expectations were repudiated by the enactment of the 1993 amendments.[10] Defendants respond that the *Spiller* decision defeats this claim as well since the Law Court specifically found that the 1991 amendments did not violate the *Spiller* plaintiffs' due process rights. *Spiller*, 627 A.2d at 517 n. 12. The implicit conclusion of such a holding, Defendants assert, is that the public purpose of the amendments, reducing state expenditures, was legitimate and that this purpose is also the basis of the 1993 amendments.

This Court, however, is hesitant to dismiss this count so early in the proceedings and finds *Spiller* to be even less persuasive regarding the analysis required on this count. In the Contract Clause analysis in *Spiller*, the Law Court was faced with the statutory scheme identical to that alleged to create a contractual obligation here. In the due process analysis, however, the Law Court's focus was on the amendments enacted in 1991, not the original scheme. Accordingly, the conclusion of the Law Court that *those amendments* did not violate state employees' due process rights is inapposite to the instant case. This Court concludes that the analysis of the purpose of the 1993 amendments, whether that purpose was legitimate, and, finally, whether the amendments have a rational relationship to that purpose, is a matter that cannot be determined at this stage of the proceedings since it cannot be said that *no* set of facts could establish a claim under this standard. Therefore, Defendants' motion to dismiss this count is denied.

---

the propriety of such evidence is better left for this Court's consideration in the proper context, if and when such evidence is actually offered on a summary judgment motion or at trial.

9. The dissenting justices in *Spiller* also noted that the majority had imposed an overly stringent standard on the plaintiffs there. Chief Justice Wathen wrote:

Although a clear statement in a statute that it constitutes a contract would be helpful, it is not the iron-clad requirement that the [Law] Court suggests. The Court would have the test be whether the statute expressly states that it is a contract. A more complex analysis, however, is required.

*Spiller*, 627 A.2d at 518 (Wathen, C.J., dissenting).

10. Plaintiffs' Complaint also asserts the "takings" clause of the Fifth Amendment of the United States Constitution as a basis for relief in Count II. Second Amended Complaint at ¶ 48. Although they failed to argue this in their brief in opposition to the instant motion, they informed this Court at oral argument that they intend to pursue this theory. Since this Court concludes that, under a substantive due process analysis, this count should not be dismissed, it need not address the merits of Plaintiffs' takings claim.

### 3. Equal Protection Clause (Count III)

Finally, the Class I Plaintiffs assert a violation of the Fourteenth Amendment Equal Protection Clause as a result of the 1993 amendments. The claim is based on the fact that Plaintiffs, along with nearly all other state employees, are now required to contribute 7.65% of their annual compensation to the retirement fund, while certain other public employees are required to contribute only 6.5%.[11] When evaluating a motion to dismiss an equal protection claim, this Court is required to "surmise whether *any* state of facts could support the Plaintiff[s'] claim that [their] constitutional guarantee to equal protection of the laws has been violated.... Plaintiff must plead minimal facts which permit a reasonable inference of discrimination." *Glidden v. Atkinson,* 750 F.Supp. 25, 27 (D.Me.1990). The United States Court of Appeals for the First Circuit once described the underlying rationale of the equal protection as follows:

> The equal protection clause seeks to ensure that *similarly situated people* are treated alike.... It 'does not require things which are different in fact or opinion to be treated in law as though they were they same.... A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived.... [W]e thus seek only the assurance that the classification at issue bear some fair relationship to a legitimate public purpose.'

*Pearson v. Fair,* 935 F.2d 401, 411 (1st Cir. 1991) (quoting *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)) (emphasis added). Since Plaintiffs do not comprise a "suspect classification," and the amendments do not implicate any fundamental rights, the proper analysis for this Court is whether the classification is "rationally related to a legitimate state interest and is neither arbitrary, unreasonable nor irrational." *LCM Enters. v. Town of Dartmouth,* 14 F.3d 675, 679 (1st Cir.1994).

The parties appear to agree that the state interest served by the 1993 amendments is fiscal savings for the State's general fund. Plaintiffs dispute whether there was a true "fiscal crisis" necessitating the amendments' enactment. They further argue that "saving money," standing alone, is not a legitimate state purpose. As stated in the previous section, this Court cannot decide at this stage whether such a purpose is legitimate as a matter of law. If the stated purpose is legitimate, it may well be that modifying the system to reduce the state's contributions for those employees for whom the contributions are paid out of the general fund is rationally related to this purpose.

Plaintiffs' equal protection claim nonetheless fails for a more fundamental reason. Plaintiffs here have not demonstrated that they are "similarly situated" to the participating local district employees whose contribution rate was unchanged by the 1993 amendments. An increase in employee contributions, such as those affected by the 1993 amendments, results in lower employer contributions. The employer contribution for those in participating local districts is "payable annually by the participating local district," 5 M.R.S.A. § 18302(1), whereas such contributions for the teachers is *appropriated* as part of the Maine legislature's biennial budget. 5 M.R.S.A. § 17154(6). Therefore, since the employer contributions for local district employees are not paid out of the state's fund, increasing their contribution would be wholly *unrelated* to the state's interest of saving state funds. Accordingly, Plaintiffs cannot be considered to be "similarly situated" to the participating local districts' employees and this claim must be dismissed.

### B. The Class II Claim—Equal Protection Clause (Count IV)

The "Class II Plaintiffs" have been certified by this Court as being "[a]ll teachers who had less than ten years of creditable service with the [MSRS] on July 1, 1993, or who had not reached the age of 60 with one

---

11. Public employees who are required to contribute only 6.5% of their salary include so-called "participating local district" employees, such as those employed by water districts. 5 M.R.S.A. §§ 18201–18806. The districts have elected to participate in the MSRS, but membership is mandatory for their employees.

year of service as of that date." Order Certifying Class Action (Docket No. 7). In other words, the class consists of all "nonvested" employees. These Plaintiffs seek relief on the basis of a violation of their rights under the Fourteenth Amendments's Equal Protection Clause, but in a manner distinct from the Class I group (of which the Class II Plaintiffs are members as well).

This class was created as a result of the extension of the reach of the 1991 amendments to include all nonvested employees, not merely those with fewer than seven years of creditable service. As with the Class I claim, the Class II claim does not allege discrimination against a suspect classification; accordingly, this Court's analysis presumes the validity of the statutory classification. The 1993 amendments unquestionably had a greater effect on the Class II teachers than on the remainder of the teacher-members of MSRS.[12] The classification, according to Defendants, was based upon the view that, since these nonvested MSRS members have not yet met the minimum requirements to qualify for any receipt of benefits in the future, they have the least "stake" in the system, reducing the State's risk of running afoul of the Contract Clause. Therefore, this claim should fail for the same reason as the Class I Plaintiffs' equal protection claim fails: *the classification was not between those who were similarly situated* and, therefore, Plaintiffs have not alleged an unlawful classification.

## C. The Class IV Claim— Age Discrimination (Count VI)

The Court certified the Class IV Plaintiffs as "[a]ll teachers who had less than ten years of creditable service with the [MSRS] on July 1, 1993, and who were on that date over the age of 40, but under the age of 50." Order Certifying Class Action. These Plaintiffs seek relief under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA").[13]

This Court is persuaded that no set of facts permits this claim to proceed. The ADEA has never been construed to permit younger persons to claim discrimination against them in favor of older persons. Indeed, the existence of a minimum age requirement suggests that it was only discrimination *in favor of* younger individuals that the law is designed to prohibit. The "Congressional statement of findings and purpose," which notes the discrimination encountered by older workers, further substantiates this reading of the statute.[14] Nowhere in the statute are there any indications that the statute may be used as a basis to assert a claim of discrimination in a retirement system by younger people based upon a disparate impact theory. Moreover, the United States Court of Appeals for the Seventh Circuit, in a case where class members were between forty and fifty years old, considered and rejected the use of ADEA to provide

---

12. As mentioned earlier, certain modifications contained in the 1993 amendments affected only those teachers whose right to retirement benefits had not yet "vested": (1) increasing the retirement age from 60 to 62 years; (2) increasing the early retirement penalty (imposed if employee retires after 25 years of service but prior to age 62) to all loss of retirement benefit income from 2.25% to 6% per retirement year preceding age 62; and (3) eliminating the inclusion of *per diem* payment of up to 30 days of unused sick leave or vacation pay in the calculation of "average final compensation" to determine the amount of retirement benefits to be paid.

13. The only distinction between Class III and Class IV is that the former clearly cannot pursue relief under the ADEA since they are under 40 years of age, 29 U.S.C. § 631(a), whereas the ADA has no minimum age requirement for those seeking its protection. In all other respects, the

two claims are identical. *See* Second Amended Complaint (Docket No. 9) at ¶¶ 69 and 78.

14. In the statement, Congress "finds and declares" that there are problems faced by older workers who attempt to find jobs after being displaced from prior jobs, that the establishment of arbitrary age limits may work to the disadvantage of older workers, that the incidence of unemployment is particularly high among older workers, and that this discrimination "burdens commerce and the free flow of goods in commerce." 29 U.S.C. § 621(a). The purpose of ADEA, therefore, was declared to be:

to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age in employment.

*Id.* § 621(b).

relief to persons suffering discrimination because they were too young. *Hamilton v. Caterpillar, Inc.*, 966 F.2d 1226, 1228 (7th Cir.1992). Therefore, Plaintiffs have failed to state a claim for relief, and this count is dismissed as well.[15]

### III. CONCLUSION

Accordingly, the Court *GRANTS* Defendants' Motion to Dismiss as to Counts III, IV, and VI and *DENIES* Defendants' motion as to Counts I and II. Count V remains under advisement with this Court.

So *ORDERED*.

---

**15.** Defendants also seek dismissal of Count V of Plaintiffs' Complaint, in which the Class III Plaintiffs allege violations of the Age Discrimination Act of 1975, 42 U.S.C. § 6101–6107. During the pendency of this motion, this Court ordered Plaintiffs to amend their complaint with respect to Counts V and VI, to aver that they had exhausted their administrative remedies and, therefore, to provide a basis for this Court's proper exercise of jurisdiction over the counts (Docket No. 21). Plaintiffs subsequently filed an Unopposed Motion For Stay of Proceedings of Count V (Docket No. 22), which asked this Court to stay further disposition of Count V of their Complaint until they completed the final step in their exhaustion of remedies on Count V. This Court granted the motion and, accordingly, reserves any action on Count V until the stay has been lifted and this Court may exercise jurisdiction.