842 F.2d 598
 9 Employee Benefits Ca 1659
 Karen PINEMAN, Alphonse Marotta, Daniel Clifford, Judith
Narus, Rose Schewe and Alfred K. Tyll, Appellants,
v.
William J. FALLON, Chairman of the State Employees
Retirement Commission, Henry E. Parker, Treasurer of the
State of Connecticut, and J. Edward Caldwell, Comptroller of
the State of Connecticut, Appellees.
 No. 363, Docket 87-7558.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 11, 1987.
Decided March 10, 1988.
 
 Paul W. Orth, Hartford, Conn., for appellants.
 Peter T. Zarella, Hartford, Conn. (Brown, Paindiris & Zarella, Hartford, Conn., of counsel), for appellees.
 Before LUMBARD, OAKES and PRATT, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 Between the years of 1939 and 1974 the Connecticut State Employees Retirement Act, 1939 Conn. Pub. Acts 271 ("SERA"), provided that female state employees with twenty-five years of service could retire with full benefits at the age of fifty, while male employees with similar service could receive full benefits only if they retired after reaching age fifty-five. In 1974 then Chief Judge T. Emmet Clarie of the United States District Court for the District of Connecticut held that the retirement plan violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e-2 to 2000e-5 (1972), and that it was therefore invalid as to male employees. Fitzpatrick v. Bitzer, 390 F.Supp. 278 (D.Conn.1974), aff'd in part and rev'd in part on other grounds, 519 F.2d 559 (2d Cir.1975), aff'd in part and rev'd in part on other grounds, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). At the first legislative session following Judge Clarie's decision, the Connecticut General Assembly reacted by passing a law which provided that all qualified state employees could retire with full benefits at fifty-five, in effect increasing by five years the service requirements for females. 1975 Conn. Acts 531 (Reg.Sess.) ("1975 Act"). The 1975 Act also contained a "grandmothering" clause, which provided that qualified female state employees who reached age fifty before June 30, 1980, could retire with full benefits. See Conn.Gen.Stat. Sec. 5-163a (1987).
 
 
 2
 The serpentine history of this case began in 1977, when certain male and female employees of the State of Connecticut[1] brought a class action challenging the constitutionality of the legislature's adjustment on the theory that the 1975 Act impaired Connecticut's obligations to provide benefits at the retirement ages previously established, in violation of the Contract Clause of the United States Constitution. Pineman v. Oechslin, 494 F.Supp. 525 (D.Conn.1980) ("Pineman I "). Judge Cabranes agreed with the plaintiffs, holding that the rights of those who had been state employees on the effective date of the 1975 Act and would not reach age fifty prior to June 30, 1980, had been violated. Id. at 553-54. In his careful opinion he attempted to comply with recent Contract Clause cases such as United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977), and Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978). He gave "respectful consideration and great weight" to relevant state law, pursuant to Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685 (1938), while recognizing that he was not bound by Connecticut's law of contracts. 494 F.Supp. at 538. He rested his opinion on the "leading case" of Bird v. Connecticut Power Co., 144 Conn. 456, 133 A.2d 894 (1957), which held that employee participation in an optional, noncontributory pension plan created contractual rights enforceable against a private employer. Relying on Bird and its progeny, Judge Cabranes concluded that mandatory participation in Connecticut's pension plan gave rise to contractual rights enforceable against the State. 494 F.Supp. at 538-39 (citing Wyper v. Providence Washington Ins. Co., 533 F.2d 57, 63 (2d Cir.1976) (construing Bird as holding that a pension plan creates contractual rights that cannot be defeated by assertion of discretionary power); Borden v. Skinner Chuck Co., 21 Conn.Supp. 184, 190, 150 A.2d 607, 610 (Super.Ct.1958)).
 
 
 3
 This court vacated and remanded Pineman I on the ground of abstention, noting that "[n]o Connecticut court ha[d] yet ruled on the precise question whether state employees have vested pension rights prior to becoming eligible to receive benefits." Pineman v. Oechslin, 637 F.2d 601, 604 (2d Cir.1981) ("Pineman II "). Following the procedure outlined in England v. Louisiana State Bd. of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), we directed the district court to retain jurisdiction pending a Connecticut court's determination of the state law question. 637 F.2d at 606 n. 9.
 
 
 4
 Plaintiffs accordingly took their claim to state court, reserving their England right to return to the district court. See 375 U.S. at 421-22, 84 S.Ct. at 467-68. The Connecticut Supreme Court then held that SERA created no contractual rights that could have been impaired by the 1975 Act. Pineman v. Oechslin, 195 Conn. 405, 488 A.2d 803 (1985) ("Pineman III "). However, the Connecticut court went on to note, albeit in dicta, that the "pension scheme establishes a property interest on behalf of all state employees in the existing retirement fund, which interest is entitled to protection from arbitrary legislative action under the due process provisions of our state and federal constitutions." Id. at 416-17, 488 A.2d at 810. Because such a claim had not been discussed by the trial court, or argued on appeal, the court declined to rule on the issue. Id.
 
 
 5
 In 1985 the plaintiffs returned to federal court, and after the resolution of some procedural questions, Pineman v. Oechslin, 616 F.Supp. 1227 (D.Conn.1985) ("Pineman IV ") (circuit court's vacatur and remand did not render void all pleadings and admissions filed after initial complaint), Judge Cabranes decided Pineman v. Fallon, 662 F.Supp. 1311 (D.Conn.1987) ("Pineman V "), dismissing the plaintiffs' action. Because we substantially agree with his thoughtful opinion on both the Contract Clause and Due Process Clause issues, and because we find no merit in the belated argument under the Taking Clause, we affirm.
 
 Contract Clause
 
 6
 While we do not intend to paraphrase the district court's opinion in its entirety, we do want to emphasize its significant points. Judge Cabranes noted, as he did in Pineman I, 494 F.Supp. at 538, that he would take guidance, but not be bound, by relevant state court holdings, 662 F.Supp. at 1315, most notably that in Pineman III. He then recounted the most recent Supreme Court pronouncement that "absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' " Id. at 1316 (quoting National R.R. Passenger Corp. v. Atchison, T. & S.F. Ry., 470 U.S. 451, 465-66, 105 S.Ct. 1441, 1451 84 L.Ed.2d 432 (1985) (quoting Dodge v. Board of Educ., 302 U.S. 74, 79, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937))). The judge then applied this standard to the Connecticut scheme, taking care to refer to the original SERA, as adopted in 1939. He then compared SERA to the Connecticut Municipal Employees Retirement Act, Conn.Gen.Stat. Sec. 2-14a (1987), which contains a specific provision that "[t]he general assembly shall enact no legislation which diminishes or eliminates the rights or benefits granted to any individual under any municipal retirement or pension system." The district court observed that where the legislature intended to create vested rights in a pension fund it did so expressly, and that SERA contained no such guarantee. 662 F.Supp. at 1316. The court further noted that government workers are less likely to have vested contractual rights prior to the satisfaction of all eligibility requirements than are workers in the private sector. Id. (citing United States v. Larionoff, 431 U.S. 864, 869, 97 S.Ct. 2150, 2154, 53 L.Ed.2d 48 (1977); Kizas v. Webster, 707 F.2d 524, 535 (D.C.Cir.1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984)).
 
 
 7
 In affirming the district court, we believe that Judge Cabranes gave appropriate deference to the state court decision in Pineman III, which determined that the employees' interest in the pension fund was neither a gratuity nor a contractual obligation, but rather said it was a property right. 195 Conn. at 416-17, 488 A.2d at 810. See Note, Public Employee Pensions in Times of Fiscal Distress, 90 Harv.L.Rev. 992, 1003-05 (1977). This analysis distinguishes pension plans which are contractual in nature by virtue of a state constitutional guarantee, see, e.g., Winston v. City of New York, 759 F.2d 242, 248-50 (2d Cir.1985) (New York City teachers' retirement system); Birnbaum v. New York State Teachers Retirement Sys., 5 N.Y.2d 1, 8-9, 176 N.Y.S.2d 984, 989-90, 152 N.E.2d 241, 258 (1958) (New York State teachers' retirement system), but still provides the employees with some degree of protection.
 
 Due Process Claims
 
 8
 Judge Cabranes also dealt appropriately with appellants' alternative contention that their retirement fund and retirement benefits when treated as property rights should have been protected under the Due Process Clause from arbitrary legislative action. He held that the 1975 Act was neither arbitrary nor irrational. 662 F.Supp. at 1317-19. He carefully noted that Due Process protections are not coextensive with prohibitions against state impairments of preexisting contracts. Id. at 1317 (citing Pension Benefit Guaranty Corp. v. Gray & Co., 467 U.S. 717, 733, 104 S.Ct. 2709, 2719, 81 L.Ed.2d 601 (1984)). We note parenthetically that the substantive due process standard, at least since the end of the Lochner era,[2] has been whether laws involving economic or property interests are rationally related to a legitimate state interest. See Williamson v. Lee Optical, 348 U.S. 483, 487-88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955); Dieffenbach v. Attorney General, 604 F.2d 187, 195 (2d Cir.1979); Image Carrier Corp. v. Beame, 567 F.2d 1197, 1203 (2d Cir.1977), cert. denied, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1979). The district court found that the 1975 legislative action was a direct response to the Fitzpatrick decision, which had struck down the state retirement system's disparate treatment of male and female employees, and then referred to Heckler v. Mathews, 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984), which had held "that an exception to the pension offset provision in the 1977 Amendments to the Social Security Act was constitutional under the equal protection component of the Due Process Clause of the Fifth Amendment." 662 F.Supp. at 1317. As Judge Cabranes pointed out, "[t]he action of Connecticut's legislature was a conscious effort to achieve uniform treatment of men and women and at the same time to achieve fiscal relief." Id. To hold otherwise, the court noted, would mean that the state would have to give twenty-five years' notice to amend its retirement plan.[3] Id. at 1318. Finally, he supported his decision by referring to the strong presumption of constitutionality that attaches to legislative acts in the economic field. Id. at 1319 (citing Ferguson v. Skrupa, 372 U.S. 726, 729-31, 83 S.Ct. 1028, 1030-31, 10 L.Ed.2d 93 (1963)).
 
 
 9
 Appellants argue that the prominent features of the 1975 Act were its "suddenness," its " 'getting back' at the federal court," its "shock at age fifty retirement," and "the dire and baseless predictions of New York City style bankruptcy," all topped off by a desire to "spend[ ] the money 'elsewhere.' " Such characterizations leave us unimpressed. Obviously, the legislature had to do something in the light of Fitzpatrick. Moreover, as the State's brief points out, the raising of Social Security levels, meaning that the State would have to pay extra Social Security taxes on behalf of its employees, produced the reciprocal effect of reducing employee contributions under the Connecticut retirement system. This happened because employee contributions into the state system are at the rate of 2% of compensation up to the Social Security taxable wage base, and 5% of amounts in excess of that wage base. We note that State contributions to SERA rose rapidly during the 1970s: in 1971 the State contributed approximately $18.5 million to SERA, and an additional $14 million to Social Security, while in 1974 the contribution to SERA was approximately $43.5 million and to Social Security about $20 million.
 
 
 10
 Moreover, the Connecticut legislature undoubtedly knew that high levels of inflation, combined with the use of the highest years of pay to calculate retirement benefits, Conn.Gen.Stat. Sec. 5-162(b) (1987), would place extreme pressure on the system. At a time of escalating wages the legislature could well have taken into account that for many years employee contributions had been made at lower pay levels, that benefits would have to be paid based on higher pay levels, and that the Connecticut plan was not well funded, so that investment return was not likely to be substantial. Connecticut's system was one of the most poorly funded in the country, and one of the most expensive as measured by percentage of payroll. Judge Cabranes referred, 662 F.Supp. at 1318 n. 7, to legislative proceedings in which a state representative criticized the pension plan as "far more liberal than is provided in any public employer" and as likely, unless modified, to bankrupt Connecticut. General Assembly Proceedings 1975: House of Representatives 6346 (June 3, 1975). The legislature clearly was well aware of what it was doing and acted within the boundaries of due process.
 
 Taking Clause
 
 11
 Finally, appellants make a belated Taking Clause argument, relying principally on Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Connolly reiterated that Taking Clause cases require "ad hoc, factual inquiries into the circumstances of each particular case," and that three factors "have 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.' " 475 U.S. at 224-25, 106 S.Ct. at 1026 (quoting Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). But while this method of analysis may be helpful to the plaintiffs, the result in Connolly--that the withdrawal of liability provisions of the Multiemployer Pension Plan Amendment Act of 1980 did not constitute a compensable taking--is not. 475 U.S. at 227-28, 106 S.Ct. at 1027. See also Bowen v. Gilliard, --- U.S. ----, 107 S.Ct. 3008, 3020, 97 L.Ed.2d 485 (1987) (amendment to Aid to Families with Dependent Children Act by Deficit Reduction Act of 1984 not violative of Taking Clause). While we do not mean to suggest, as Justice Holmes once did in respect to the Equal Protection Clause, that the Taking Clause has become the "last resort of constitutional arguments," Buck v. Bell, 274 U.S. 200, 208, 47 S.Ct. 584, 585, 71 L.Ed. 1000 (1927), we think it adds little to the Contract Clause and Due Process analysis already undertaken. Focusing on the Connolly/Penn Central factors, the governmental action undertaken in the 1975 Act was not unreasonable. Connecticut did not physically invade or permanently appropriate any of the employees' assets for its own use; instead, by grandmothering in those whose pension rights would vest within five years of the date of the bill but not those whose rights would vest subsequently, the legislature merely made an adjustment of the benefits and burdens of economic life, not a taking requiring government compensation. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 16, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976) ("legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations"). Nor does the Act have any severe economic impact. All that it required is that women (and men) work until age fifty-five to receive full pension benefits, which is what male employees were required to do before Fitzpatrick v. Bitzer struck down the prior scheme. While they may have to make additional contributions to the plan, any hardship is balanced by increased benefits. Finally, since there were no contractual rights, the Act did not interfere with reasonable investment-backed expectations. Employees were surely aware that pension benefits were subject to legislative adjustment, though of course hoping that benefits would increase and the retirement age be reduced. But such hopes cannot be transformed into "reasonable expectations" simply by the wave of a legal wand. Cf. Metropolitan Transp. Auth. v. ICC, 792 F.2d 287, 296-97 (2d Cir.) (no such expectations arose from public authority's lease of trackage), cert. denied, --- U.S. ----, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986).
 
 
 12
 Judgment affirmed.
 
 
 
 [1]
 Certain men were included as plaintiffs because for a period of time after the court's order in Fitzpatrick but before the effective date of the 1975 Act qualified male employees could receive full retirement benefits at age 50
 
 
 [2]
 Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); see L. Tribe, American Constitutional Law 450-55 (1978); cf. Sunstein, Lochner's Legacy, 87 Colum.L.Rev. 873 (1987)
 
 
 [3]
 As it was, the 1975 Act allowed employees eligible to retire under the old system before 1980 to receive the pre-1975 level of benefits