**Richard M. PARKER, et al., Plaintiffs,**

v.

**David S. WAKELIN, et al., Defendants.**

**Civil No. 94–157–P–C.**

United States District Court, D. Maine.

Aug. 1, 1996.

48

Donald F. Fontaine, Fontaine & Beal, P.A., Portland, ME, for Plaintiffs.

H. Cabanne Howard, Asst. Attorney General, Augusta, ME, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, Chief Judge.

Plaintiffs, the Maine Education Association ("MEA") and a class representing public school teachers throughout the State of Maine ("MSRS members"), bring this action challenging the constitutionality of certain amendments to the Maine State Retirement System ("MSRS" or "Maine Plan") passed by the Maine Legislature in 1993. P.L.1993, ch. 410, pt. L, §§ 12, 13, 28, 31–37 (codified as amended at 5 M.R.S.A. §§ 17001, 17701–B,

17806, 17851, 17852) (collectively "1993 Amendments"). Plaintiffs seek declaratory and injunctive relief to block the implementation of the amendments. Second Amended Complaint (Docket No. 23).

This Court has already entertained Defendants' Motion to Dismiss (Docket No. 11), which was granted in part and denied in part (Docket No. 28). *Parker v. Wakelin*, 882 F.Supp. 1131 (D.Me.1995). After a three-day bench trial and extensive post-trial briefing, the case now comes before the Court for final decision. For the reasons that follow, the Court will find that: (1) the 1993 Amendments, as applied to MSRS members whose benefits had "vested" prior to the effective date of the amendments, violate the Contract Clause of the United States Constitution; (2) the 1993 Amendments, as applied to MSRS members whose benefits had not "vested" prior to the effective date of the amendments, violate no provision of the United States Constitution.

## I. FACTS

In 1942, the Maine Legislature created the Maine State Retirement System for two purposes: (1) attracting and keeping qualified employees in state service throughout their productive years and (2) providing benefits upon their retirement, disability, or death. 5 M.R.S.A. § 17050 (1989). Membership in the system is mandatory for all public school teachers, including all Plaintiffs in this case. 5 M.R.S.A. §§ 17001(14), 17651 (1989). All MSRS members are required to make contributions from their salaries to the fund from which benefits are paid. 5 M.R.S.A. § 17701, 17701–A, 17701–B (1989 & Supp.1995). The State of Maine must also contribute annually to the fund an amount sufficient to discharge its future pension obligations. 5 M.R.S.A. § 17153(1–A)(B) (Supp.1995). MSRS mem-

bers, however, do not qualify to receive the service retirement benefits representing the combination of those two contributions until "vesting," *i.e.*, until they meet eligibility requirements either by providing ten years of creditable service if they are not in service at the statutory retirement age or by providing one year of creditable service if they are in service at the statutory retirement age.[1] 5 M.R.S.A. § 17851 (1989 & Supp.1995). If MSRS members end their service prior to vesting, they are entitled only to the return of their contributions with interest. 5 M.R.S.A. § 17705(2).

In 1993, in order to lower the State's budget allocation for its contribution to the fund, legislators enacted certain amendments to the Maine Plan. Defendants' Responses to Plaintiffs' Second Request for Admissions (Plaintiffs' Ex. 501) ¶ 7 ("Defendants' Second Admissions"). The 1993 Amendments operated to the disadvantage of Plaintiffs without providing offsetting advantages to Plaintiffs or to the trust fund generally. Stipulation No. 1 of the Parties (Plaintiffs' Ex. 526) ¶ 5 ("First Stipulation"); *see* Defendants' Second Admissions ¶ 4.

Three of those modifications adversely affected all teachers' pensions: (1) raising the rate of teachers' required contribution from 6.5% of their salary to 7.65%;[2] (2) capping at 5% in each year, and at a total of 10% over the highest 3 years, the salary increase that may be included in calculating teachers' retirement benefit;[3] (3) delaying by six months the first cost-of-living adjustment to teachers' retirement benefit.[4] First Stipulation ¶ 3.

Three other modifications adversely affected only the pensions of those teachers whose right to retirement benefits had not yet vest-

---

**1.** Although the term "vesting" is nowhere defined in the plan, it has been used frequently, consistently, and without objection throughout this litigation to refer to the satisfaction of this requirement for receiving benefits. *E.g., Parker* 882 F.Supp. at 1134 n. 2, 1136, 1139–40; Plaintiffs' Reply Brief at 5 n. 4; Defendants' Post-Trial Brief at 4; Trial Transcript *passim; see*

Plaintiffs' Exs. 215A at 11, 215B at 11, 215C at 12.

**2.** P.L.1993, ch. 410, pt. L, § 28, *enacting* 5 M.R.S.A. § 17001–B.

**3.** P.L.1993, ch. 410, pt. L, § 13, *amending* 5 M.R.S.A. § 17001(13)(C).

**4.** P.L.1993, ch. 410, pt. L, § 31, *amending* 5

50

ed:[5] (1) increasing teachers' regular retirement age from sixty to sixty-two;[6] (2) increasing the early retirement penalty from 2.25% to 6% of teachers' retirement benefit for each year preceding age 62;[7] (3) eliminating the inclusion of *per diem* payment of up to thirty days of unused sick leave or vacation pay in calculating teachers' retirement benefit.[8] First Stipulation ¶ 4.

At trial, Plaintiffs presented extensive documentary and testimonial evidence relevant to the factual questions raised by its constitutional claims.[9]

On the Contract Clause issue of whether the 1993 Amendments would substantially impair the retirement benefits alleged to be contractual, Plaintiffs presented evidence demonstrating that they reasonably relied on, and were induced to serve the State of Maine by, the continued existence of certain retirement benefits.[10] *See infra* Section II.

---

M.R.S.A. § 17806(3).

5. In light of this structure of the 1993 Amendments, the Court will use the term "nonvested member Plaintiffs" to refer to those to whom all 1993 Amendments apply, and "vested member Plaintiffs" to refer to those to whom only the three amendments described in the preceding paragraph above apply.

6. P.L.1993, ch. 410, pt. L, §§ 33, 35, *amending* 5 M.R.S.A. § 17851(1–A) & (2–A).

7. P.L.1993, ch. 410, pt. L, § 37, *amending* 5 M.R.S.A. § 17852(3–A).

8. P.L.1993, ch. 410, pt. L, § 12, *amending* 5 M.R.S.A. § 17001(13)(B).

9. Plaintiffs also presented "evidence" relevant to certain *legal* questions raised by its constitutional claims. Defendants have objected to these submissions to the extent that they are offered for the purpose of demonstrating legislative intent. The parties agree that the requirement that a court consider the language and circumstances of the relevant statute to determine whether a contract is formed requires this Court to consider, along with the text of the Maine Plan, its legislative history. *Parker v. Wakelin,* 882 F.Supp. 1131, 1137 n. 8 (D.Me.1995). Those two sources have provided the Court with an indication of legislative intent on that issue that is sufficiently clear that the Court has not needed to resort to the various other more questionable "circumstances" that Plaintiffs' contend might also reflect legislative intent. *See infra* Section II.A.1 (finding legislative intent to create implied-in-fact contract based on text and legislative history). These submissions include:
• The testimony of individual former members of the MSRS Board of Trustees and administrators of the MSRS, whose opinions Plaintiffs' would impute to the legislature. Testimony of Robert Bourgault, March 20, 1996, Trial Transcript at 256–74; Testimony of Patricia M. Dunn, March 19, 1996, Trial Transcript at 172–93; Testimony of Paula Gaudet, March 20, 1996, Trial Transcript at 229–56; Testimony of Philip R. Gingrow, March 20, 1996, Trial Transcript at 274–81; Testimony of Claude R. Perrier, March 20, 1996, Trial Transcript at 327–45; Deposition of Jon A. Lund, March 11, 1996, Plaintiffs' Ex. 299C; Deposition of Claude R. Perrier, May 8, 1995, Plaintiffs' Ex. 299B; Deposition of David S. Wakelin, January 17, 1995, Plaintiffs' Ex. 299A.
• The testimony of individual former legislators and members of legislative commissions, whose opinions Plaintiffs' would impute to the legislature. Testimony of Robert Bourgault, March 20, 1996, Trial Transcript at 256–74; Testimony of Harrison L. Richardson, March 20, 1996, Trial Transcript at 214–229.
• MSRS manuals and newsletters, the content of which Plaintiffs would impute to the legislature. Plaintiffs' Exs. 201, 202, 203, 204, 205, 206, 211, 215A, 215B, 215C, 215D, 215E, 222, 223, 224, 225, 226, 228, 230, 258, 259, 270.
• Actuary reports and intra-executive documents which share the common characteristic of never having been addressed to the legislature or individual legislators, but the content of which Plaintiffs nevertheless would impute to the legislature. Plaintiffs' Exs. 170, 214, 218, 401, 402, 409.
• Memoranda from MSRS personnel addressed to individual legislators, the content of which Plaintiffs would impute to the legislature. Plaintiffs' Exs. 113, 172, 220, 227, 290, 298.
That "evidence," admitted at trial *de bene esse,* is superfluous in this case for the purpose of determining legislative intent to create an implied-in-fact contract. Therefore, the Court will not decide whether that evidence may properly be considered for that purpose in another case.

10. Because the Court will find that a contract has formed for Contract Clause purposes under an implied-in-fact contract theory, it need not, and therefore will not, consider Plaintiffs' quasi-contract theory. *See infra* note 12. Accordingly, the Court admits only for the purpose of determining whether vested member Plaintiffs' contractual rights are substantially impaired (and not for the purpose of determining quasi-contract formation) the evidence of reasonable reliance upon which the factual findings below are based. This evidence includes both individual vested member Plaintiffs' testimony to this effect and the MSRS manuals and newsletters which informed their reliance. Testimony of Richard M. Parker, March 19, 1996, Trial Transcript at 62–95; Testimony of Paul L. Hutchins, March 19,

A.2. Plaintiff Richard M. Parker testified that MSRS benefits induced him to accept his job as a public school teacher in Maine, and that he relied specifically on the continued existence of the benefits adversely altered by the cap on salary increases calculable for determining annuity payments and by the increased contribution rate. Testimony of Richard M. Parker, March 19, 1996, Trial Transcript at 63, 81–83, 86. Plaintiff Paul L. Hutchins testified to the same inducement and reliance, adding his specific reliance on the cost-of-living increase at 6 months. Testimony of Paul L. Hutchins, March 19, 1996, Trial Transcript at 118–120. Similarly, Plaintiff Daniel J. Lowell testified that MSRS pension benefits induced him to work for the State and that he specifically relied on benefits reduced by the cap. Testimony of Daniel J. Lowell, March 19, 1996, Trial Transcript at 138, 143–44.

All MSRS members who testified said that no one ever told them that their benefits could *not* be reduced unilaterally by the legislature. *E.g.*, Trial Transcript at 89, 129, 149. No MSRS members who testified, however, said that anyone ever told them that their benefits *could* be reduced unilaterally by the legislature. *E.g.*, Trial Transcript at 89, 117.

On the Contract Clause issue of whether the 1993 Amendments were necessary to the state's public purpose of saving money in a time of fiscal crisis, Plaintiffs presented evidence demonstrating that they were not. *See infra* Section II.A.3. In particular, the testimony of Mr. Bent Schlosser indicated specific alternative means available to the legislature for cutting the budget without impinging on teachers' pension benefits. Testimony of Bent Schlosser, March 21, 1996, Trial Transcript at 410–13. Moreover, although the testimony of Defendants' witness, Mr. H. Sawin Millett, provided plausible estimates of the considerable savings to the State issuing from the pension cuts, it provided no indication that those cuts were the only means of generating those savings. *See* Testimony of H. Sawin Millett, March 21, 1996, Trial Transcript at 349–98.

On the Takings Clause issue of the economic impact of the 1993 Amendments on nonvested member Plaintiffs, *see infra* Section II.C., several such Plaintiffs testified. *E.g.*, Testimony of Paula Reed, March 19, 1996, Trial Transcript at 34–49; Testimony of Lana R. Savage, March 19, 1996, Trial Transcript at 49–61; Testimony of Nancy B. Sullivan, March 19, 1996, Trial Transcript at 95–110. The Court finds the expert testimony of actuary Michael E. Gallagher, however, most relevant to this point. Testimony of Michael E. Gallagher, March 20, 1996, Trial Transcript at 299–326. Mr. Gallagher was asked to describe the economic impact of the 1993 Amendments on a hypothetical MSRS member with nine years and ten months of creditable service just before the amendments, who currently has 12 years of creditable service at age 51 and still intends to retire at age 60. *Id.* at 314–15. Mr. Gallagher testified that, under those circumstances, the total value of that member's benefit would be 24%, or $75,000, less than if the 1993 Amendments were not in effect. *Id.* Cross-examination revealed, however, that an additional two years of work and contribution, from ages sixty to sixty-two, would cut the devaluation by more than half, down to $30,000, reducing her monthly annuity payment by only $100. *Id.* at 322–326.

## II. DISCUSSION

Plaintiffs challenge the constitutionality of the 1993 Amendments on three separate grounds: (1) they violate the Contract Clause of article I, § 10 (Count I); (2) they violate the Due Process Clause of the Fourteenth Amendment (Count II); (3) they violate the Takings Clause of the Fifth Amendment (Count II). Plaintiffs will prevail only in their claim that the 1993 Amendments violate the Contract Clause as applied to vested MSRS members.

### A. *Contract Clause (Count I)*

▮ The Contract Clause of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts." U.S. Const. art. 1,

1996, Trial Transcript at 110–30; Testimony of Daniel J. Lowell, March 19, 1996, Trial Transcript at 131–50; Plaintiffs' Exs. 215A, 215B, 215C, 215D, 215E, 223, 226, 258, 259.

§ 10. Since *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 137–39, 3 L.Ed. 162 (1810), courts have regularly applied the Clause to contracts between states and private parties. Analysis under the Contract Clause proceeds in four steps. The Court must inquire: (1) whether there is a contractual relationship; (2) whether a change in law impairs that contract; (3) whether that impairment is substantial; (4) whether that substantial impairment is reasonable and necessary to serve an important public purpose. *General Motors Corp. v. Romein,* 503 U.S. 181, 186, 112 S.Ct. 1105, 1109–10, 117 L.Ed.2d 328 (1992); *United States Trust Co. v. New Jersey,* 431 U.S. 1, 25, 97 S.Ct. 1505, 1519, 52 L.Ed.2d 92 (1977); *McGrath v. Rhode Island Retirement Bd.,* 88 F.3d 12, 16–17 (1st Cir.1996). When the state is a party to the contract at issue, the court must undertake the fourth inquiry at a heightened level of scrutiny " 'because the State's self-interest is at stake.' " *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412–13 n. 14, 103 S.Ct. 697, 705 n. 14, 74 L.Ed.2d 569 (1983) (quoting *United States Trust Co.,* 431 U.S. at 26, 97 S.Ct. at 1519–20); *see Nat'l Educ. Ass'n–Rhode Island v. Retirement Bd. of Rhode Island Employees' Retirement System,* 890 F.Supp. 1143, 1151 (D.R.I.1995) (characterizing test as one of intermediate scrutiny).

The Court will conclude: (1) that the MSRS members who had met the service requirement qualifying them for pension benefits, i.e., those who were "vested," as of July 1, 1993 then had a contractual relationship with the State, but that MSRS members who were not vested as of July 1, 1993 did not then have a contractual relationship with the State; (2) that the 1993 Amendments reducing the benefits of vested members substantially impaired their contract with the State; [11] (3) that the 1993 Amendments reducing the benefits of vested members were not necessary to serve the purpose of resolving Maine's fiscal crisis. Accordingly, the Court will declare that the 1993 Amendments

violate the Contract Clause as applied to vested members and so will enjoin the application of those Amendments to those members.

### 1. Is there a Contract?

■ Whether a statute gives rise to a contractual relationship is a question of federal constitutional law. *Romein,* 503 U.S. at 186, 112 S.Ct. at 1109–10. To the extent that the determination of this federal question involves the interpretation of state law, however, it is appropriate to "accord respectful consideration and great weight to the views of the State's highest court." *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685 (1938).

■ Analysis of this question must begin with the well-established proposition "that absent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' " *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 465–66, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432 (1985) (quoting *Dodge v. Bd. of Educ.,* 302 U.S. 74, 79, 58 S.Ct. 98, 100, 82 L.Ed. 57 (1937)). Plaintiffs may overcome this presumption by demonstrating that "the language and circumstances [of the statute] evince a legislative intent to create private rights of a contractual nature enforceable against the state." *United States Trust Co.,* 431 U.S. at 17 n. 14, 97 S.Ct. at 1515 n. 14; *Hoffman v. City of Warwick,* 909 F.2d 608, 614 (1st Cir.1990). The statutory language itself, however, constitutes the primary object of this inquiry. *Nat'l R.R. Passenger Corp.,* 470 U.S. at 466, 105 S.Ct. at 1451–52.

■ This Court will apply the common law of contracts to determine whether a contract has formed between Plaintiffs and the State for Contract Clause purposes.[12] *See,*

---

**11.** The Court has combined the second and third elements of the analysis because there is no dispute as to the second, namely, whether the 1993 Amendments constitute an impairment at all.

*See* Defendants' Responses to Plaintiffs' Second Request for Admissions (Plaintiffs' Ex. 501) ¶ 4.

**12.** Because this Court will decide that, under the common law of contracts, the statutory language

*e.g., Nat'l Educ. Ass'n–Rhode Island,* 890 F.Supp. at 1156–59 (applying "traditional contract law principles"). According to those principles, three familiar elements are typically required for the formation of a contract: offer, acceptance, and consideration. *See Restatement (Second) of Contracts* §§ 17(1), 22(1) (hereinafter *"Restatement"); Estes v. Smith,* 521 A.2d 682, 684 (Me.1987). An offer is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement* § 24. Offers may be express or implied. Arthur L. Corbin, *Corbin on Contracts* § 1.19, at 55 (Joseph M. Perillo rev. ed. 1993). An offeree may accept the offer by "a manifestation of assent to the terms thereof ... in a manner invited or required by the offer." *Restatement* § 50; *Ouellette v. Bolduc,* 440 A.2d 1042, 1045 (Me. 1982). To render an offeror's promise enforceable, an offeree must provide consideration, which is some "performance or return promise ... sought by the promisor in exchange for his promise." *Restatement* § 71(2); *Whitten v. Greeley–Shaw,* 520 A.2d 1307, 1310 (Me.1987). When the offeror seeks a performance rather than a return promise, the offeror proposes a unilateral contract. Corbin, *Corbin on Contracts* § 1.23, at 89; *Chenard v. Marcel Motors,* 387 A.2d 596, 600 (Me.1978).

In light of these principles, it should come as no surprise that most contemporary public pension plans have been held to give rise to implied-in-fact unilateral contracts within the reach of the Contract Clause. *McGrath,* 88 F.3d at 16–18; 60A Am.Jur.2d, Pensions and Retirement Funds, § 1620, at 950 (1988). A legislature's manifestation, through the language and circumstances of the pension statute, of its intent to enter a bargain with its employees, whereby the state provides them pension benefits in exchange for a long period of their loyal service and monetary contribution, establishes the existence of an offer. *E.g., Nat'l Educ. Ass'n–Rhode Island,* 890 F.Supp. at 1157. State employees' performance of that service and contribution for the period required for eligibility constitutes both acceptance (because it manifests their assent to the terms of the state's offer) and consideration (because it represents the performance sought by the state in exchange for its promise of benefits). *Id.* at 1158–59. Thus, an implied-in-fact unilateral contract implicating the Contract Clause is formed. *See Brand,* 303 U.S. at 100, 58 S.Ct. at 446 ("a legislative enactment may contain provisions which, when accepted as the basis of action by individuals, become contracts between them and the State or its subdivisions within the protection of article I, § 10.")

Although public pension plans generally share this contractual character, they vary widely as to when in the employment relationship the benefits they provide become contractual. *McGrath,* 88 F.3d at 17–18; *Spiller v. State,* 627 A.2d 513, 516 & n. 10 (Me.1993). Careful review of the relevant cases reveals that two main factors account for the variation among courts on this point. The first is variation in the language and circumstances of each state's pension statute.[13] The second, and perhaps more often determinative, is variation in the theory of pension contracts that each court applies. *Pineman v. Oechslin,* 195 Conn. 405, 488 A.2d 803, 807–10 (1985) (surveying and choosing among various pension contract theories); *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467, 473–75 (1980) (same). Two cases illustrate in an especially clear and relevant way how each of these two factors can affect the resolution of this issue.

and circumstances of the Maine plan (constituting an offer), combined with the conduct of member Plaintiffs (constituting acceptance and consideration, but not here considered for legislative intent), gives rise to an implied-in-fact contract for Contract Clause purposes, this Court need not consider the theories of quasi-contract and trust that Plaintiffs also advance to establish the existence of a contract for Contract Clause purposes. Accordingly, this Court will not consider Plaintiffs' exhibits to the extent that they are offered in support of those theories.

**13.** To the extent that the questions of whether a contract is formed and when a contract is formed are necessarily intertwined, it would seem particularly appropriate that courts consider primarily the language, as well as the circumstances, of the statute. *See United States Trust Co.,* 431 U.S. at 17 n. 14, 97 S.Ct. at 1515.

In the recent case of *McGrath v. Rhode Island Retirement Board,* 88 F.3d 12 (1st Cir.1996), the Court of Appeals for the First Circuit discussed the effect of statutory language that expressly reserves to a state legislature the power to amend or terminate its public pension plan. *Id.* at 17–19. The court noted that, under the common law of contracts generally, when an offeror expressly reserves the power to revoke an offer to enter a unilateral contract until performance is complete, the offer is illusory and may not yet give rise to a contract. *Id.* at 17–18 (citing *Restatement* § 45, cmt. b). The court added that, under the common law of pension contracts particularly, however, such a revocation power is effective only until "an employee's rights under the plan vest," the time at which "an employee fulfills the service requirements entitling him or her to retirement benefits under a pension plan." *Id.* at 18–19. The court nevertheless expressed doubt regarding whether this limitation on an employer's reserved power to revoke pension benefits applies with the same force to state pension plans, since this limitation might constitute an unprecedented infringement of state sovereignty. *Id.* at 19; *see also Nat'l R.R. Passenger Corp.,* 470 U.S. at 467 & n. 22, 105 S.Ct. at 1452 & n. 22 (discussing unlimited effect of express reservation *by Congress* of revocation power).

In *Petras v. State Board of Pension Trustees,* 464 A.2d 894 (Del.1983), the Supreme Court of Delaware, in deciding the issue of when its state pension plan created enforceable contractual rights to benefits, exemplified a widely held theory of pension contracts. The plan at issue was typical of many contemporary plans in that it contained provisions that: extended benefits to members; predicated eligibility for those benefits upon the completion of a minimum period of service; and required contributions of members.[14] *Id.* at 895. The court affirmed the holdings of earlier Delaware court cases that this statutory scheme gave rise to enforceable contractual rights, but only "upon fulfillment of the eligibility requirements." *Id.* at 869. Correspondingly, "no contract exists between an employee and the State, concerning the state pension plan, unless and until the pension vests." *Id.* The court concluded, therefore, that "pension rights may be changed at any time before they become vested." *Id.*

■ The pension theory embodied in the *Petras* decision has been applied in other jurisdictions as well. *Petras,* 464 A.2d at 896 (collecting cases); *Baker v. Oklahoma Firefighters Pension & Ret. Sys.,* 718 P.2d 348, 352 (Okla.1986); *see Singer,* 607 P.2d at 474–75. Upon adopting the *Petras* view of pension contracts, the Supreme Court of Oklahoma concisely articulated the compelling theoretical and practical reasons for doing so:

> Viewing the contract between the state and its employees as coming into existence at the point of eligibility allows the necessary flexibility in fiscal planning which must be given to the Legislature. This view also avoids the necessity of engaging in the tortuous applications of contract law which other jurisdictions have applied in finding that rights, which they have characterized as being in existence, [nevertheless] remain subject to unilateral modifications.[15] This view also realistically acknowledges the contingent nature of the relationship as it ripens into a contractual obligation on the part of the state.

*Baker,* 718 P.2d at 352. This theory of pension contracts, whereby benefits vest and become enforceable only upon satisfaction of service requirements for eligibility, has been described elsewhere as a "deferred compen-

---

14. There is no indication that the plan contained any statutory provision expressly reserving the power to revoke benefits.

15. Along the same lines, the Supreme Court of Connecticut has criticized the "limited vesting" theory of pension contracts, *e.g., Public Employees' Retirement Board v. Washoe County,* 96 Nev. 718, 615 P.2d 972, 974–75 (1980), whereby pension benefits become contractual on acceptance of employment but nevertheless remain subject, pursuant to an implied term of that contract, to "reasonable modification" by the employer:

> It makes little sense to strain established rules of statutory interpretation to find a contract where the requisite express legislative intent is lacking, only to strain other equally well settled legal principles to allow for necessary unilateral modification by the state.

*Pineman v. Oechslin,* 195 Conn. 405, 488 A.2d 803, 809 (1985).

sation" theory. *McGrath v. Rhode Island Retirement Board,* 906 F.Supp. 749, 760 n. 1 (D.R.I.1995) (citing *Nat'l Educ. Ass'n–Rhode Island,* 890 F.Supp. at 1156), *aff'd,* 88 F.3d 12 (1st Cir.1996).

It is within this legal context that this Court will determine whether and when the Maine State Retirement System creates a contract with any of the present Plaintiffs for Contract Clause purposes.

This Court holds that, at some point in the employment relationship between the State of Maine and MSRS members, the Maine Plan creates a contract that binds the State to provide MSRS members with certain retirement benefits. The Maine Plan contains all the elements which have been found almost uniformly to give rise to an implied-in-fact unilateral pension contract. The pension statute contains provisions which manifest the State of Maine's willingness to enter into a bargain with Maine State employees, whereby retirement benefits would be exchanged for ten years of loyal service and monetary contribution, in a way that justifies those employees in believing their acceptance is invited. *See* 5 M.R.S.A. §§ 17050, 17151, 17851. MSRS members both manifest their assent to (and, therefore, acceptance of) this offer and provide the consideration [16] sought by the State by performing ten years of service and contribution to the system. In this way, the Maine State Retirement System creates a contractual relationship between the State of Maine and MSRS members.

The question remains of when in the employment relationship those enforceable contract rights arise. Consistent with the method of other courts, this Court will make this determination by considering the language and circumstances of any relevant statutory provisions and by applying the most appropriate theory of pension contracts.

The language and circumstances of 5 M.R.S.A. § 17801 bear particular relevance to the question of when the Maine Plan creates contractual rights to retirement benefits. That section provides:

> No amendment to this Part may cause any reduction in the amount of benefits which would be due to a member based on creditable service, earnable compensation, employee contributions, pick-up contributions, and the provisions of this part on the date immediately preceding the effective date of the amendment.

5 M.R.S.A. § 17801. This Court discerns in this provision two statements of legislative intent pertinent to the present issue. First, the legislature intends to be bound, as a term of the implied pension contract whose existence is established *supra,* not to reduce a member's benefits *after* they become "due to a member." Second, the legislature intends *not* to be bound not to reduce a member's benefits *before* they become "due to a member." *Accord Spiller,* 627 A.2d at 516 (reading § 17801 to reserve right to modify benefits not then due). This implied reservation of the power to revoke, as to members whose benefits are not yet "due," the offer giving rise to the contract renders that offer illusory as to those members. *See McGrath,* 88 F.3d at 17–18. These two facets of § 17801 indicate legislative intent to create enforceable contract rights to benefits only when they become "due to a member."

It is necessary to determine, then, when in the employment relationship benefits become "due to a member." The term "due" is nowhere defined in the Maine Plan. It is clear, however, that the phrase "due to a member" cannot mean "due to a retiree to whom benefits are currently payable" because retirees are, by definition, not members. 5 M.R.S.A. § 17654(2). Nor is it legitimate to characterize as "due to a member" benefits for which the member is not even eligible. *Accord Spiller,* 627 A.2d at 516 (finding no benefits "due to" plaintiff members, none of whom had met eligibility requirements). Correspondingly,

---

16. The so-called "Towne Report," which was adopted by the Legislative Recess Committee to which it was submitted and, in turn, by the entire Maine Legislature itself, indicated that "[p]ension payments are generally deemed as made *in consideration of* past services, injury or loss sustained, merit, poverty, etc." Report to Legislative Recess Committee on Maine State Retirement System and Social Security Coverage, April 8, 1954, at 17 (Plaintiffs' Ex. 207) (emphasis added) (hereinafter "Towne Report").

once a member has met eligibility requirements for benefits, it becomes possible, even plausible, to describe those benefits as "due to a member." Moreover, the legislative history of § 17801 indicates that the provision was initially recommended and ultimately passed "to insure the continuation of *presently vested rights.*" Final Report of the Committee on Veterans and Retirement on its Study of the Maine State Retirement System at 4 (January 1975) (Plaintiffs' Ex. 105B) (emphasis added). Therefore, this Court concludes that the language and circumstances of 5 M.R.S.A. § 17801 indicate that retirement benefits become enforceable in contract under the Maine Plan when those benefits are "due to a member," here understood as "vested in a member," where vesting occurs upon completion of the service requirement for eligibility.

The theory of pension contracts which this Court finds most appropriate to the Maine Plan yields the same result. That theory, embodied in the *Petras* decision discussed *supra,* provides that pension benefits become enforceable in contract only upon vesting, defined as satisfaction of eligibility requirements. The Court considers this theory applicable to the Maine Plan for three reasons. First, the Maine Plan contains provisions substantially similar to those in *Petras,* in that both plans extend benefits to members, predicate eligibility for those benefits on the completion of a service requirement, and require monetary contribution. Second, the theoretical and practical strengths of the *Petras* theory, as explicated in *Baker,* apply with no less force to this case. Third, the *Petras* theory has been fairly characterized as a "deferred compensation" theory of pension contracts, and the legislative history of the Maine Plan contains frequent references to an understanding of the system as one of "deferred compensation." *See, e.g.,* Towne Report at 17–19. Therefore, the theory of pension contracts best suited to the circumstances of this case also indicates that pension benefits under the Maine Plan become contractual only upon vesting.

The language and circumstances of the relevant provision of the Maine Plan, as well as the appropriate theory of pension contracts, then, both point to the same conclusions with respect to the present Plaintiffs.

First, the Court holds that MSRS members not vested on the effective date of the 1993 Amendments do not have enforceable contract rights to the benefits reduced by the those amendments. Under the applicable theory of pension contracts, members of a pension plan have no contractual rights to benefits until vesting. Even if it were somehow more appropriate to apply a different theory of pension contracts under which the implied offer of benefits is viewed as extended to nonvested member Plaintiffs, the reservation in § 17801 of the power to reduce benefits not then "due to a member" renders the offer of those benefits illusory as to those Plaintiffs. *McGrath,* 88 F.3d at 17–18. Finally, although § 17801 indicates the legislature's intent, as a term of its implied-in-fact contract with members, not to reduce benefits then "due to a member," the benefits reduced by the 1993 Amendments were not "due to" member Plaintiffs not presently vested on the effective date of those amendments.

Second, the Court holds that MSRS members vested on the effective date of the 1993 Amendments have enforceable contract rights to the benefits reduced by those amendments. Once again, under the applicable theory of pension contracts, members of a pension plan acquire contractual rights to benefits upon vesting. Moreover, the legislature's reservation in § 17801 of the power to reduce benefits not then "due to a member" renders the offer of those benefits illusory only as to nonvested members, not as to vested members.[17] Perhaps most important of all, § 17801 indicates the legislature's intent, as a term of its implied-in-fact contract, not to reduce benefits then "due to a member," and the benefits reduced by the 1993 Amendments were "due to" member Plaintiffs presently vested on the effective date of those amendments.

---

**17.** The effect of the legislature's revocation power may also not extend to vested members as a matter of the common law of pension contracts. *See McGrath,* 88 F.3d at 17–19.

Therefore, because Plaintiffs not presently vested before the effective date of the 1993 Amendments have no enforceable contract rights to the benefits reduced by those amendments, their claim under the Contract Clause must fail. Correspondingly, because Plaintiffs presently vested before the effective date of the 1993 Amendments do have enforceable contract rights to the benefits reduced by those amendments, their claim under the Contract Clause may proceed to the next stage of analysis.

### 2. Is the Contract Substantially Impaired?

To establish a violation of the Contract Clause, those Plaintiffs with contractual rights in the benefits modified by the 1993 Amendments must yet demonstrate that those modifications "substantially impair" those rights. *Romein,* 503 U.S. at 186, 112 S.Ct. at 1109–10. Although guidance from the Supreme Court on this issue· is sparse, two rules relevant to this case have emerged at the appellate level. First, a contract with a state is substantially impaired if the legislature adversely modifies a term that induced the plaintiff to enter the contract and on whose continued existence the plaintiff reasonably relies. *Baltimore Teachers' Union v. Mayor and City Council of Baltimore,* 6 F.3d 1012, 1018 (4th Cir.1993); *see Energy Reserves Group,* 459 U.S. at 411, 103 S.Ct. at 704 (citing *El Paso v. Simmons,* 379 U.S. 497, 515, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965)). Second, a pension contract with a state is not substantially impaired if the

legislative modification "bear[s] some material· relationship to the purpose of the pension system and its successful operation; and any disadvantage to employees [is] accompanied by comparable new advantages." *State of Nevada Employees Ass'n v. Keating,* 903 F.2d 1223, 1227 (9th Cir.1990).[18]

The Court finds that the three 1993 Amendments applicable to vested member Plaintiffs substantially impair their contract with the State of Maine. Once again, those amendments would: (1) increase the employee contribution rate from 6.5% to 7.65%; (2) cap the salary increases that may be included in the calculation of the annuity benefit; and (3) postpone for six months the first cost-of-living increase in the annuity benefit after retirement. First Stipulation ¶ 3. None of these impairments either bear any material relationship to the successful operation of a pension plan or create benefits to offset the burdens they impose. Testimony at trial also reveals both that the benefits impaired by these amendments induced vested member Plaintiffs to enter their contract with the State of Maine, and that those Plaintiffs reasonably relied on the continued existence of those benefits. *See* Testimony of Richard M. Parker, Paul L. Hutchins, and Daniel J. Lowell, cited *supra* Section I. Moreover, Courts have commonly found an increase in the rate of contribution in particular to represent a substantial impairment. *Marvel v. Dannemann,* 490 F.Supp. 170, 171 (D.Del. 1980); *Pennsylvania Fed'n of Teachers v. Sch. Dist. of Philadelphia,* 506 Pa. 196, 484

---

18. This Court is aware that the test outlined above is commonly labeled the "reasonable modification" test. *E.g., Public Employees' Retirement Board v. Washoe County,* 96 Nev. 718, 615 P.2d 972, 974–75 (1980). For three reasons, however, this Court declines to apply that label to this test in the context of this case. First, using the phrase *"reasonable* modification" to describe a test that gives content to "substantial impairment" risks its confusion with, and misapplication as, the next step in the analysis (whether the substantial impairment is *"reasonable* and necessary to serve an important public purpose"). *See, e.g.,* Plaintiffs' Reply Brief (Docket No. 58) at 11; *Halpin v. Nebraska State Patrolmen's Retirement System,* 211 Neb. 892, 320 N.W.2d 910, 915 (1982). Second, using the phrase "reasonable modification" to describe this test risks its confusion with the contract term both that state courts commonly imply in

state pension contracts as a matter of state law, and from which the test originally derives. By contrast, this Court reads *Keating* to say that, as a matter of federal law, a contract modification is not a "substantial impairment" for Contract Clause purposes if it meets the requirements of this test, regardless of whether the pension contract in question contains such an implied term as a matter of state law. *Keating,* 903 F.2d at 1227. Third, the test better helps define the ordinary meaning of the phrase "substantial impairment." A modification can hardly be described as an impairment, least of all a substantial one, if it creates benefits to offset its burdens. This is especially so when the purpose of such a modification is to enhance the successful operation of a pension system. These two factors, then, describe particularly well what a "substantial impairment" is not, less well what a "reasonable modification" is.

A.2d 751, 753 (1984); *Singer,* 607 P.2d at 476–77. Therefore, the 1993 Amendments substantially impair the contractual rights of vested member Plaintiffs to the retirement benefits at issue.

### 3. Is the Substantial Impairment Reasonable and Necessary to Serve an Important Public Purpose?

■ Even though the State's impairment of vested Plaintiffs' rights to retirement benefits is substantial, it may yet be permissible under the Contract Clause "if it is reasonable and necessary to serve an important public purpose." *United States Trust Co.,* 431 U.S. at 25, 97 S.Ct. at 1519. The Court need not decide whether the present substantial impairment is "reasonable," nor whether the public purpose it serves is "important," because the Court finds that it is not "necessary" to that purpose. It is undisputed that the State's purpose in reducing pension benefits was to help alleviate the State's fiscal crisis. Persuasive expert testimony presented at trial, which described various means of cutting expenditures to serve this purpose without impairing Plaintiffs' contract rights, defeats Defendants' claim that the impairment was necessary to serve that purpose. *See* Testimony of Bent Schlosser, cited *supra* Section I. Therefore, the State's substantial impairment of vested Plaintiffs' contractual benefits constitutes a violation of the Contract Clause.

### B. Due Process Clause (Count II)

■ Plaintiffs [19] claim that the 1993 Amendments violate the substantive aspect of the Due Process Clause of the Fourteenth Amendment. U.S. Const. amend XIV, § 1. To withstand such a challenge, the 1993 Amendments need only be rationally related to a legitimate state purpose. *Parker v. Wakelin,* 882 F.Supp. 1131, 1138 (D.Me.

1995); *see Williamson v. Lee Optical,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 464–65, 99 L.Ed. 563 (1955); *Pineman v. Fallon,* 842 F.2d 598, 601 (2d Cir.1988). The Court finds the 1993 Amendments rationally related to the legitimate state purpose of reducing expenditures in a time of fiscal crisis. *See Spiller,* 627 A.2d at 521 (Wathen, C.J., and Glassman, J., dissenting). Therefore, the 1993 Amendments, as applied to nonvested member Plaintiffs, do not violate the Due Process Clause.

### C. Takings Clause (Count II)

■ Plaintiffs also claim that the 1993 Amendments violate the Takings Clause of the Fifth Amendment. U.S. Const. amend V. To determine whether legislation effects an unconstitutional taking of property,[20] the Court considers three factors of " 'particular significance': (1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.' " *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986) (quoting *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

■ The Court finds that the 1993 Amendments, as applied to nonvested Plaintiffs, do not effect a taking of their alleged property because none of these three factors so indicate. First, although the economic impact on nonvested Plaintiffs, as illustrated by the near-worst-case scenario addressed by an expert actuary at trial, is "significant," *Washington Legal Foundation v. Massachusetts Bar Foundation,* 993 F.2d 962, 976 (1st Cir.1993), it is neither "severe," *Pineman v. Fallon,* 842 F.2d 598, 602 (2d Cir.1988), nor of a sort that "extinguish[es] a fundamental

**19.** Because the Court has determined that application of the 1993 Amendments to vested member Plaintiffs violates the Contract Clause, it is unnecessary to decide whether that same application also violates the Due Process Clause of the Fourteenth Amendment or the Takings Clause of the Fifth Amendment. It remains necessary, however, to determine whether the application of the 1993 Amendments to nonvested member Plaintiffs violates either of those other two con-

stitutional provisions. Therefore, Sections II.B. and II.C. will pertain only to *nonvested* member Plaintiffs.

**20.** The Court assumes, without deciding, that nonvested Plaintiffs' interest in their pension benefits constitutes "property" for Takings Clause purposes.

attribute of ownership," *Agins v. Tiburon,* 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980). *See* Testimony of Michael E. Gallagher, cited *supra* Section I. Second, the 1993 Amendments do not interfere to any extent with investment-backed expectations of nonvested members because, without contractual rights, nonvested members have no investment-backed expectations subject to interference. *Pineman,* 842 F.2d at 603. Third, the 1993 Amendments constitute neither a permanent physical invasion of their benefits nor an elimination of the economic value of their benefits. *Washington Legal Foundation,* 993 F.2d at 975 (*citing Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1014–16, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992)). Instead, they amount only to an ordinary "adjustment of the benefits and burdens of economic life." *Pineman,* 842 F.2d at 602 (characterizing change in pension plan that increases retirement age) (citing *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 16, 96 S.Ct. 2882, 2892–93, 49 L.Ed.2d 752 (1976)). Therefore, this Court finds no unconstitutional taking in the application of the 1993 Amendments to nonvested member Plaintiffs.

### III. CONCLUSION

Accordingly, it is hereby *ORDERED* that those 1993 Amendments to the Maine State Retirement System, P.L.1993, ch. 410, pt. L, §§ 13, 28, 31, that purport to apply to the retirement benefits of MSRS members who were "vested" prior to the effective date of those amendments be, and they are hereby *DECLARED,* to violate the Contract Clause as applied to those members. It is further *ORDERED* that application of those amendments to "vested" MSRS members be, and it is hereby, *ENJOINED.* Counsel for the Plaintiffs shall submit to the Court, within ten (10) days from the date of the docketing of this order, a proposed order of judgment for consideration by the Court which will fully implement the decision set forth above.