USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ Nos. 96-2225 96-2226 96-2227 96-2228 RICHARD M. PARKER, ET AL., Plaintiffs, Appellees, Cross-Appellants, v. DAVID S. WAKELIN, ET AL., Defendants, Appellants, Cross-Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Gene Carter, U.S. District Judge] ____________________ Before Torruella, Chief Judge, Boudin and Lynch, Circuit Judges. _____________________ Cabanne Howard, Assistant Attorney General, with whom Andrew Ketterer, Attorney General, and  Thomas D. Warren , State Solicitor, were on brief for appellants. Donald F. Fontaine, with whom Kaighn Smith, Jr. and Fontaine & Beal, P.A. were on brief for appellees. ____________________ August 11, 1997 ____________________ TORRUELLA, Chief Judge. The question presented by this appeal is whether certain legislative amendments to the Maine State Retirement System ("MSRS") violate the Contract Clause of the United States Constitution as applied to plaintiffs, a class comprised of current Maine public school teachers all of whom are members of the MSRS. Following a bench trial, the district court held that certain amendments violated the Contract Clause as applied to those public employees who had satisfied the service requirements under the MSRS and whose pension rights had thereby "vested." Finding no unmistakable intent on the part of the Maine legislature to create private contractual rights against the reduction of pension benefits prior to the point at which pension benefits may actually be received, we hold that the Maine amendments do not violate the Contract Clause with regard to any of the plaintiffs. Accordingly, we reverse the district court's holding that the amendments violate the Contract Clause as applied to "vested" members of the MSRS. BACKGROUND None of the relevant facts recited below are in dispute. I. The Maine State Retirement System (MSRS)  The MSRS operates as a public pension trust pursuant to Maine's public employee retirement benefit statute.  See 5 M.R.S.A. SS 17001-18663 (1989 & Supp. 1996). The MSRS was created in 1942 to encourage "qualified persons to seek public employment and to continue in public employment in their productive years." 5 M.R.S.A. S 17050 (1989). For all Maine state employees, including -2- the public school teachers comprising the plaintiff class in the instant case, membership in the MSRS is mandatory. 5 M.R.S.A. SS 17001(14), 17651 (1989). All MSRS members make mandatory contributions into a pension fund. The State of Maine also contributes annually to maintain the fund's actuarial soundness with regard to future benefit obligations. 5 M.R.S.A. SS 17701-A, 17701-B, 17153(1-A)(B)(Supp. 1996). The MSRS can be classified as a "defined benefit system," in that the retirement benefits provided for teachers are defined upon employment and financed in part by their fixed contributions into the system. The teachers, as members of the system, qualify to receive retirement benefits upon (1) reaching the statutory retirement age,  and (2) satisfying  either of the following service requirements: (a) at least ten years of creditable service; or (b) at least one year of creditable service prior to reaching the statutory retirement age while in public service. 5 M.R.S.A. S 17851 (1989 & Supp. 1996). Alternatively, a member may be entitled to receive retirement benefits when he or she retires after performing at least 25 years of creditable service. Id. In the district court's decision, the term "vesting" was used to describe the satisfaction of the service requirements. See  Parker v.  Wakelin, 937 F. Supp. 46, 49 n.1 (D. Me. 1996). However, as the district court in fact noted, the term "vesting" does not figure in the statutory scheme itself, which simply indicates the age and service requirements that must be met. See 5 M.R.S.A. S 17851 -3- (1989 & Supp. 1996). Members who terminate their public service prior to satisfying the pension eligibility requirements are entitled to a return of their contributions, with interest. 5 M.R.S.A. S 17705(2). An eligible retiree earns a pension in the amount of two percent of his or her "average final compensation" multiplied by the number of years of total creditable public service (up to 25 years). 5 M.R.S.A. S 17852 (1989). The legislative amendments at issue on this appeal affect, among other things, the process by which one computes an employee's "average final compensation" in such a manner as to reduce the expected pension benefits of many members. The State of Maine concedes that the sole purpose for enacting the changes in the terms and conditions of retirement benefits ("the 1993 Amendments") was to save money by lowering budget allocations by the state to the trust funds of the MSRS; their enactment coincided with other responses to a state fiscal crisis. The 1993 Amendments may be sorted into two groups: three changes apply to the pensions of  all current teacher-members of the MSRS, while three others apply only to those who had not satisfied the service requirements under the MSRS as of the effective date of  Other non-pension benefits under the retirement system, such as life insurance and disability retirement benefits, may be received without having satisfied any minimum service requirement. A slightly different method applies to those retirees whose eligibility is based on having completed 25 or more years of creditable service. -4- the amendments. None of the amendments affected retirees earning pensions as of the effective date. The amendments that affected all of the plaintiffs were: (1) an increase in the rate of required member contributions from 6.5 percent of their salary to 7.65 percent; (2) a cap on the salary increase that may be included in the course of calculating the level of teachers' retirement benefits; and (3) a six-month delay in the first cost-of-living adjustment of retirement benefits. See P.L. 1993, ch. 410, pt. L, SS 28, 13, 31. The district court held that these three modifications were unconstitutional as applied to those plaintiffs who had satisfied the service requirements. The other 1993 amendments, which only applied to those who had not served 10 years as of the effective date of the amendments, were: (1) an increase in the regular retirement age from 60 to 62; (2) an increase in the early retirement penalty from 2.25 percent to 6 percent of the teachers' retirement benefit for each year preceding age 62; and (3) the elimination of an inclusion of per diem payment of up to thirty days of unused sick or vacation pay in the course of calculating teachers' retirement benefits.  See P.L. 1993, ch. 410, pt. L, SS 33, 35, 37, 12. It is not disputed that the 1993 Amendments operate to the disadvantage of MSRS members without providing substantive offsetting benefits.  These provisions are codified as amended at 5 M.R.S.A. SS 17001- B, 17701(13)(C), 17806(3). These provisions are codified as amended at 5 M.R.S.A. SS 17851 (1-A) & (2-A), 17852(3-A), 17001(13)(B). -5- When the MSRS was first adopted in 1942, the legislature made no express statement as to its ability to amend or alter the pension benefit structure. In 1975, the Maine legislature enacted the following provision: No amendment to this chapter shall cause any reduction in the amount of benefits which would be due to the member based on creditable service, compensation, employee contributions and the provisions of this chapter on the date immediately preceding the effective date of such amendment. P.L. 1975, ch. 622, S 6, codified at 5 M.R.S.A. S 17801 (1989), under the title "Amendment not to cause reduction in benefit." II. The Proceedings Below Plaintiffs, the Maine Education Association and a class representing public school teachers throughout the State of Maine, challenged the constitutionality of the 1993 Amendments under the Contract Clause, the Due Process Clause, and the Takings Clause, seeking declaratory and injunctive relief to block implementation. The district court held that: (1) the 1993 Amendments violated the Contract Clause only as applied to MSRS members whose benefits had "vested" under the system; and (2) the 1993 Amendments did not  The current version has a few minor changes in language: No amendment to this Part may cause any reduction in the amount of benefits that would be due to a member based on creditable service, earnable compensation, employee contributions, pick-up contributions and the provisions of this Part on the date immediately preceding the effective date of the amendment. 5 M.R.S.A. S 17801 (1989). -6- violate any other provision of the constitution. By using the term "vested" the district court referred to those MSRS members who had satisfied the service requirements under the system -- a service requirement is a necessary (but not a sufficient) condition to being entitled to actually receive a pension. See Parker v. Wakelin, 937 F. Supp. at 49 n.1. On appeal, the state defendants ask that we hold that the 1993 Amendments do not violate the Contract Clause as applied to any of the plaintiffs. In their cross-appeal, the plaintiffs argue that the 1993 Amendments violate the Contract Clause as applied to all teacher members of the MSRS prior to the effective date of the amendments, and that the 1993 Amendments also violate substantive due process. DISCUSSION The essential facts being undisputed, this appeal turns on questions of law over which we exercise de  novo review. See Villafane-Neriz v. FDIC, 75 F.3d 727, 730 (1st Cir. 1996). This appeal raises a legal issue of considerable importance, one we specifically left unresolved in  McGrath v.  Rhode Island Retirement Board, 88 F.3d 12, 19 (1st Cir. 1996). When stated broadly, the issue is whether a legislative amendment to a state employee retirement pension plan that is detrimental to employees triggers further scrutiny under the Contract Clause as applied to state employees whose pension rights under the plan have "vested" prior to such amendment. In McGrath, we did not need to resolve this issue, because the plaintiff's pension rights had not vested prior -7- to the legislative amendment at issue, and because the legislature specifically reserved the power to amend or terminate the plan as to nonvested members. 88 F.3d at 19-20. We now conclude that a blanket answer to the issue of Contract Clause protection for vested employees is not possible, because, as we explain below, a detailed examination of the particular provisions of a state pension program will be required prior to determining the nature and scope of the unmistakable contractual rights, if any, that are created by a given state legislature. I. General Contract Clause Principles Although the wording of the Contract Clause appears uncompromising -- "No state shall . . . pass any . . . Law impairing the Obligation of Contracts . . . " -- the Supreme Court does not interpret it as an absolute bar on the impairment of either governmental or private contractual obligations.  See  United States  Trust  Co. v. New  Jersey, 431 U.S. 1, 21 (1977) ("'[T]he prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula.'" (quoting Home Bldg.  &  Loan  Ass'n v. Blaisdell, 290 U.S. 398, 428 (1934))). Rather, the Supreme Court has elaborated an analysis under which a court must first ascertain whether a change in state law has resulted in "'the substantial impairment of a contractual relationship.'" General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992) (quoting Allied Structural Steel Co. v. Spannaus, 438 U.S.  U.S. Const. art. I, S 10, cl. 1. -8- 234, 244 (1978)). Next, the reviewing court must determine whether the impairment is nevertheless justified as "reasonable and necessary to serve an important public purpose." United  States Trust  Co., 431 U.S. at 25-26. Where the contract allegedly impaired is one created, or entered into, by the state itself, less deference to a legislative determination of reasonableness and necessity is required, because "the State's self-interest is at stake." Id. at 25;  see also  McGrath, 88 F.3d at 16 (when the state itself is a party, it "must do more than mouth the vocabulary of the public weal in order to reach safe harbor."). The first step described above can be further broken down into "three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Romein, 503 U.S. at 186. In the instant case, we need not reach the issue of impairment or substantiality, because the plaintiffs fail to demonstrate the existence of a contractual relationship protected by the Contract Clause. At the same time that less deference is given to state legislatures when it is the state that wishes to relieve itself of contractual obligations, a clear showing must be made that a state law has created a contractual obligation on the part of the state in the first place. See  Hoffman v.  Warwick, 909 F.2d 608, 614 (1st Cir. 1990) ("The Contract Clause is applicable to contracts into which the state enters, but normally state statutory enactments do not of their own force create a contract with those whom the statute benefits."). -9- II. The Unmistakability Doctrine In order to deem a state legislative enactment a contract for the purposes of the Contract Clause, there must be a clear indication that the legislature intends to bind itself in a contractual manner. See  National R.R. Passenger Corp. v.  Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66 (1985) ("[A]bsent some clear indication that the legislature intends to bind itself contractually, the presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" (quoting Dodge v. Board  of  Educ., 302 U.S. 74, 79 (1937))); United States Trust Co., 431 U.S. at 17 n.14 (a statute may be treated as a binding contract "when the language and the circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the state."). This threshold requirement for the recognition of public contracts has been referred to as the "unmistakability doctrine." See McGrath, 88 F.3d at 19 (citing United  States v. Winstar, 116 S. Ct. 2432 (1996)). In United  States v. Winstar, the Supreme Court traced the history of the unmistakability doctrine from Justice Marshall's opinion in  Fletcher v.  Peck, 10 U.S. (6 Cranch) 87 (1810), and explained its purpose. Because legislatures should not bind future legislatures from employing their sovereign powers in the absence of the clearest of intent to create vested rights protected under the Contract Clause, courts developed canons of construction disfavoring implied governmental contractual -10- obligations. Thus, "'neither the right of taxation, nor any other power of sovereignty, will be held . . . to have been surrendered, unless such surrender has been expressed in terms too plain to be mistaken.'" Winstar, 116 S. Ct. at 2455 (quoting  Jefferson Branch Bank v. Skelly, 68 U.S. (1 Black) 436, 446 (1862)). The requirement that "the government's obligation unmistakably appear thus served the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of State authority to limit the subsequent exercise of legislative power." Winstar, 116 S. Ct. at 2455. In its most recent Contract Clause case holding a state to its obligations under a public contract, the Supreme Court found ample evidence that a promise on the part of the state had been made in a contractual setting, in return for a specific bargained- for benefit, and found that the statutory scheme clearly employed the language of contract. See  United States Trust Co. , 431 U.S. at 17-18 (involving a legislative covenant between New York and New Jersey and future bondholders where the very "purpose of the covenant was to invoke the constitutional protection of the Contract Clause as security against repeal"). In the instant case, we must determine whether the MSRS also evinces a clear intent on the part of the Maine legislature to create contractual rights against the modification of pension benefits. III. Pension Plans as Contractual Obligations -11- The law governing the rights of members of public employee retirement plans varies greatly from state to state, and has not been the subject of federal regulation or harmonization. There is no modern Supreme Court case that provides guidance as to the rights public employees have to their pensions. Pennie v. Reis, 132 U.S. 464 (1889), stands for the proposition that public employee pension programs do not create vested rights against legislative modifications, and thus are gratuities that a state may freely revoke. See Pennie, 132 U.S. at 470-71 (holding California's adjustment of a pension benefit plan for police officers did not constitute deprivation of property without due process). Although this "gratuity" approach has been rejected by most state courts,  Pennie has never been explicitly overruled.  See generally 60A Am. Jur. 2d, Pensions and Retirement Funds, SS 1620- 29 (discussing the shift away from the gratuity approach toward the contract approach). Pennie has, however, been ignored as a precedent, perhaps because its dicta regarding public pension benefits arose in the context of a Due Process claim. Although only two other circuits have addressed this question, state courts have generally viewed a public pension plan as creating implied-in-fact unilateral contracts. See  McGrath, 88 F.3d at 17 (collecting cases). The Ninth Circuit in State  of Nevada Employees Ass'n v. Keating, 903 F.2d 1223 (9th Cir. 1990), agreed with the Nevada Supreme Court that the "'better reasoned view' recognizes that non-vested employees have contractual rights in pension plans 'subject to reasonable modification in order to -12- keep the system flexible to meet changing conditions, and to maintain the actuarial soundness of the system.'" 903 F.2d at 1227 (quoting  Public Employees' Retirement Board v.  Washoe, 96 Nev. 718 (1980)). Thus the Ninth Circuit in  Keating concluded that a Nevada law penalizing the withdrawal of pension contributions and thereby altering the previous law that contained no such penalty, violated the Contract Clause because it did not represent a reasonable modification of the pension plan. The court in Keating noted, however, that the state did not dispute that Nevada's statutes providing pensions for public employees created contractual obligations. See  Keating, 903 F.2d at 1225-26. The Fourth Circuit also ignored the gratuity approach in the course of holding that legislative amendments to a North Carolina public employee disability benefit plan did not violate the Contract Clause because, under relevant state law interpretations of the statute, rights to benefits under the plan did not vest until retirement. See Kestler v. Board of Trustees of North Carolina Local Governmental Employees' Retirement Sys. , 48 F.3d 800, 804 (4th Cir. 1995) (no Contract Clause violation where plaintiff was not vested at the time of the effective date of the amendment). These cases reflect the modern trend among state supreme courts, which is to protect pension rights on the theory that a state's promise of pension benefits represents an offer that can be accepted through the employee's performance -- thus, a unilateral, implied-in-fact contract is created that is binding on the state. See generally Andrew Mackenzie, " Spiller v.  State: Determining the -13- Nature of Public Employees' Rights to Their Pensions," 46 Me. L. Rev. 355, 357-59 (1994); Note, John J. Dwyer, "'Til Death Do Us Part: Pennsylvania's 'Contract' With Public Employees For Pension Benefits," 59 Temp. L.Q. 553 (1986). There is much disagreement on the details, however, under this unilateral contract approach. One widely held view is that at some point, public employees' contractual rights to pension benefits vest; after vesting, the state is contractually bound to honor its obligation to provide a pension without any further modifications or decreases in overall benefit levels. See, e.g., Petras v. State  Bd.  of  Pension Trustees, 464 A.2d 894, 896 (Del. 1983) (rights vest upon completion of minimum service requirement); Baker v. Oklahoma Firefighters  Pension  &  Ret.  Sys., 718 P.2d 348, 353 (Okla. 1986) (same);  Leonard v.  City of Seattle , 503 P.2d 741, 746 (Wash. 1972) (en banc) (same);  Sylvestre v.  State, 214 N.W.2d 658, 666-67 (Minn. 1973) (rights vest at start of employment);  Yeazell v.  Copins, 402 P.2d 541 (Ariz. 1965) (en banc) (same as Sylvestre). Several states have provisions in their constitutions declaring that vesting occurs at the moment of public employment and barring any legislative modifications that retroactively reduce the accrued benefits of public employees. See, e.g., Alaska Const. art. XII, S 7; Haw. Const. art. XVI, S 2; Ill. Const. art. XIII, S 5; Mich. Const. art. IX, S 24; N.Y. Const. art. V, S 7. Several states follow a modified contract approach, which permits some unilateral legislative modifications of pension plans as long as the legislature offsets any new disadvantage with comparable new -14- advantages, as seen from the point of view of the public employee. See,  e.g.,  Singer v.  City of Topeka , 607 P.2d 467, 475 (Kan. 1980); Betts v.  Board of Admin. of the Pub. Employees' Ret. Sys. , 582 P.2d 614, 617 (Cal. 1978) (en banc);  Opinion of the Justices , 303 N.E.2d 320, 328 (Mass. 1973). At least two state supreme courts, including Maine's, have declined to use the language of "vesting" in the course of upholding modifications to pension benefits at any time during the employment relationship.  See  Spiller v.  State, 627 A.2d 513, 516 (Me. 1996);  Pineman v.  Oechslin, 488 A.2d 803 (Conn. 1985). The Connecticut Supreme Court in fact rejected the contract model altogether and indicated that public employees have a property interest in pension benefits that may not be arbitrarily confiscated by the state, under the Due Process Clause. Pineman, 488 A.2d at 809-810.  Although we have recognized the diversity of contract theories adopted by state courts -- in particular the divergence of approaches with regard to when exactly binding rights to a certain level of retirement benefits "vest" -- we have never chosen to adopt a particular approach to  public pension rights. See  McGrath, 88 F.3d at 16-18. In  McGrath, we noted that, as a general matter, pensions are viewed as "a species of unilateral contracts," although there is considerable disagreement as to when rights in public pension plans vest, if at all. Id. at 17. But in the course of analyzing a Contract Clause challenge to certain amendments to the Rhode Island public employee retirement system, we eschewed participating -15- in abstract contract theory in favor of performing a close analysis of the statutory provision at issue. Such an approach is wise, because the unmistakability doctrine mandates that we determine whether the challenged legislative enactment evinces the clear intent of the state to be bound to particular contractual obligations. It may well be that the variety of approaches adopted by state supreme courts reflect, in part, differences in the structure of the various state pension programs, and of the intention of the different state legislatures that created them. There is a danger, however, in adopting a theory of pension rights and subsequently forcing a given program to fit under it. Any given theoretical approach will make assumptions regarding the intent of legislatures to be bound, as well as the time at which vesting should occur, which may be contradicted by particular statutory provisions such as, for example, an express reservation of the right to revoke pension benefits. When reviewing a particular enactment, therefore, we must suspend judgment and "proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation." Atchison, Topeka & Santa Fe Ry. Co. , 470 U.S. at 466. The district court's decision protects Maine public employees from benefit reduction once employees' rights are "vested." Unfortunately, the line it drew between teachers who had  In McGrath, we specifically reserved judgment on the question of whether such express reservations are valid after the point at which pension rights are "vested." 88 F.3d at 19. -16- and had not completed a minimum service requirement, cannot be justified on the basis of the Maine statute, which nowhere speaks of "vesting" as understood by the district court. -17- IV. Contractual Rights Under the MSRS Turning to the MSRS, we ask whether the Maine Legislature has unmistakably evinced the intention to create binding contractual rights. See Hoffman, 909 F.2d at 614 (determining whether "language and circumstances" of Rhode Island benefits statute reveal "a legislative intent to create private contractual rights"). Specifically, in light of the plaintiffs' claims, we must ask whether Maine has bound itself not to modify or alter, at any time before the employee's retirement, the level of pension benefits an employee would expect to receive. The statutory language is the primary focus of the inquiry. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. at 466. Under the terms of the MSRS, public employees who have met certain service and age requirements are entitled to receive pensions. At the heart of this case is 5 M.R.S.A. S 17801, which reflects the state's intent to reserve the power to amend the amount of pension benefits, as well as, arguably, the state's intent to create private contractual rights. That is, the State's self-imposed limitations on its legislative power through section 17801 may reasonably serve as an indication of its intent to guarantee pension benefits once they are "due," as well as an obvious reservation of amendment powers with regard to the amount of benefits that are not "due." The parties disagree as to the unmistakable intentions section 17801 represents.  Section 17801 states that "no amendment . . . may cause any reduction in the amount of benefits which would be due a member -18- . . . on the date immediately preceding the effective date of the amendment." Much turns on the meaning of "due." The plaintiff public school teachers argue that benefits are "due" from the moment of employment, and that this section merely confirms the applicability of a strict implied-in-fact, unilateral contract approach. The State contends that section 17801 is a reservation of the power to alter benefits until the retirement benefits are literally due to be received. The third alternative, not the basic position of either party, is that benefits are "due" if a teacher has completed the statute's initial service requirements, although pension benefits are not yet currently payable. The Maine Supreme Judicial Court's Spiller decision, which deserves our "'respectful consideration and great weight,'" Romein, 503 U.S. at 187 (quoting  Indiana ex rel. Anderson v.  Brand, 303 U.S. 95, 100 (1938)), clearly rejects the alternative pressed by the teachers. The court was "unpersuaded by the reasoning of those jurisdictions that have discerned in the statutory language the creation at the time of employment of binding contractual rights." Spiller, 627 A.2d at 516. It held that, as to the Spiller plaintiffs, none of whom had satisfied the statute's service requirements at the time of the statutory amendment challenged in Spiller, "[n]one of the benefits at issue here were due . . . on the effective date of [the] legislation." Id. The question remains, however, whether section 17801 should be read to protect a teacher -- and possibly to create contract rights -- whenever a teacher satisfies the service -19- requirements even though the teacher is still in active service and no pension is currently payable. Section 17801 does not clearly compel such a reading, since "due" could easily be read to mean currently payable. And such a reading would also arguably conflict with some of the language in  Spiller (although not its holding) and with the dissent's reading of the majority. See  Spiller, 627 A.2d at 516 ("By implication, the [statutory] language reserves to future legislatures the power to modify prospective service retirement benefits for employees to whom benefits are not then due"); id. at 519 ("Although the Court does not reach the issue today, its interpretation of section 17801 also undermines the pension benefits of those employees who have met the eligibility conditions for pension benefits but [have not yet retired].") (Wathen, C.J., dissenting). Even if we treat the statute as unclear and conclude that Spiller leaves the issue open, we think that the principle of unmistakability would defeat the teachers' claim that the contract rights are created when service requirements are satisfied. We need not decide whether the statute ever gives rise to a contractual relationship; it is enough to say that it does not clearly do so before a teacher retires, and thus gains an immediate right to the payment of pension benefits. Because there is no attempt here to take away retirees' benefits, there can be no plausible contract clause claim in this case. The district court reasoned that "due" should be construed as referring to the point at which a member qualifies for -20- retirement benefits. But even if this is a possible reading, we do not think this language could be said to reflect the unmistakable intent of the Maine Legislature, particularly when the legislature could very well have indicated as much. In fact, the MSRS makes no reference to "vesting." As the district court points out, and as the plaintiffs have vigorously argued, there is some evidence indicating that certain legislators wanted to protect vested rights; and that the Maine Legislature, in enacting section 17801, responded to a report that recommended the protection of employees' accrued retirement benefits from retroactive reductions. But the language of section 17801 remains at best ambiguous, and we cannot find that the legislature as a whole unmistakably intended to create contract rights at the time that service requirements were satisfied -- especially where, as here, it would have been easy to make any such intention crystal clear.  We do not decide today whether, in order to satisfy the unmistakability doctrine, a public pension statute must explicitly employ the language of contract. Nor need we decide whether Contract Clause principles would apply if Maine sought to reduce pension benefits already "due" to present retirees, a step that would in any case appear to require revision of the present section 17801. To resolve this appeal, we need only conclude that there is no unmistakable intent by the Maine Legislature to create an enforceable private contract right against the modification of the plaintiffs' retirement benefits until they are actually receivable. -21- As we indicated in McGrath, public employment contracts operate in a "special employment environment" requiring recognition of "the states' flexibility vis-a-vis the retirement benefits that it offers public employees." 88 F.3d at 19. Whether the amendments here are wise or justified as a matter of political philosophy is not our concern. As Contract Clause challenges arise, we must look to the language of the pension statutes to determine, as a threshold matter, whether the unmistakability doctrine is satisfied. Here, as it relates to Maine's purported obligation not to alter the benefits of its public teacher employees, it is not. Thus, no violation of the Contract Clause may be found. With regard to the teacher-plaintiffs' due process claim on cross-appeal, we affirm the decision of the district court, finding no due process violation, for the reasons given in its opinion, extending that reasoning to all plaintiffs. See 937 F. Supp. at 58.  CONCLUSION For the reasons stated in this opinion, the decision of the district court, to the extent that it found the Maine legislative amendments violative of the Contract Clause, is reversed in part, and to the extent that it found no constitutional violations, is affirmed in part. -22-