# United States Court of Appeals
## For the First Circuit

No. 17-1293

CRANSTON FIREFIGHTERS, IAFF LOCAL 1363, AFL-CIO, on its own
behalf and on behalf of its members; INTERNATIONAL BROTHERHOOD
OF POLICE OFFICERS, LOCAL 301, AFL-CIO, on its own behalf and on
behalf of its members,

Plaintiffs, Appellants,

v.

GINA M. RAIMONDO, in her capacity as Governor of the State of
Rhode Island; SETH MAGAZINER, in his capacity as General
Treasurer of the State of Rhode Island; THE EMPLOYEES'
RETIREMENT SYSTEM OF RHODE ISLAND, by and through Seth
Magaziner, in his capacity as Chairperson of the Retirement
Board, and Frank J. Karpinski, in his capacity as Executive
Director of the Retirement Board; CITY OF CRANSTON, by and
through its Finance Director, Robert F. Strom, and its
Treasurer, David Capuano,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Elizabeth Wiens, with whom Gursky|Wiens Attorneys at Law,
Ltd. was on brief, for appellants.
Nicole J. Benjamin, with whom John A. Tarantino, Adler Pollock
& Sheehan P.C., Rebecca Partington, Rhode Island Department of

Attorney General, and Michael Field, Rhode Island Department of Attorney General were on brief, for appellees Gina M. Raimondo, in her capacity as Governor of the State of Rhode Island, Seth Magaziner, in his capacity as the General Treasurer of the State of Rhode Island, and the Employees' Retirement System of Rhode Island.

Nicholas L. Nybo, with whom William M. Dolan III and Adler Pollock & Sheehan P.C. were on brief, for appellee City of Cranston.

January 22, 2018

**KAYATTA**, **Circuit Judge**.  In 2011, Rhode Island enacted legislation modifying various state-run pension plans for government employees, including a plan that covered municipal firefighters and police officers.  Generally speaking, the modifications reduced the value of the benefits payable under the plan in order to ameliorate what the State perceived to be a serious and growing liability that would be difficult to fund. The unions representing the firefighters and police officers employed by the City of Cranston (the "Unions") filed this lawsuit claiming that the modifications unconstitutionally repudiated contractual obligations owed to the Cranston employees.

We affirm the district court's dismissal of the complaint.  In so doing, we find that the complaint fails as a matter of law to allege that the challenged legislation unconstitutionally impaired any contractual rights of the Unions' members.  We also find that federal court is not the proper forum within which to litigate the Unions' undeveloped claims that the City of Cranston is failing to live up to the terms of its ordinances or collective bargaining agreements, and we find that this lawsuit provides no opportunity to challenge the terms of a settlement by other parties in another lawsuit.  Our reasoning follows.

## I.

## A.

Since 1936, Rhode Island has maintained a retirement system for state employees, administered by a retirement board. See Nat'l Educ. Ass'n-R.I. ex rel. Scigulinksy v. Ret. Bd. of the R.I. Emps. Ret. Sys. (NEA), 172 F.3d 22, 24 (1st Cir. 1999). In 1951, the State created a retirement system for municipal employees, including firefighters and police officers. See 1951 R.I. Pub. Laws Ch. 2784 (codified as amended at 45 R.I. Gen. Laws § 45-21-1, et seq. (2017)). Seventeen years later, the State created an alternative, dedicated plan for police officers and firefighters (the "Optional Police and Fire Retirement System"). See 1968 R.I. Pub. Laws Ch. 230 (codified as amended at 45 R.I. Gen. Laws § 45-21.2-1, et seq. (2017)).

At least one municipality, the City of Cranston, also operated its own municipal retirement system. By the mid-1990s, Cranston was experiencing a severe operating deficit and its municipal pension plan was critically underfunded. The Unions and the City came up with a potential solution: all new hires, and perhaps some recent hires, would transfer to the state retirement system. One significant impediment to this rescue plan stood in the way: the state system provided less favorable benefits. Cranston and the Unions overcame this impediment by convincing representatives from the state retirement board to submit special

legislation that would provide certain Cranston police officers and firefighters who joined the state system with benefits in excess of those provided to others under that system. The Rhode Island General Assembly passed the special legislation, which became law on August 9, 1996. 1996 R.I. Pub. Laws Ch. 374 ("1996 Special Legislation").

The 1996 Special Legislation amended state law to allow new members and certain existing members of the Cranston Fire and Police Departments to opt into the state's Optional Police and Fire Retirement System, to provide higher "final compensation" for purposes of calculating their pension benefits, to provide a higher annual cost of living adjustment ("COLA") payment (three percent compounded), and to increase employee contributions from seven percent to ten percent. The statute also provided that Cranston Fire and Police Department enrollees who transferred from the municipal pension plan into the state system would, upon joining, "waive and renounce all accrued rights and benefits of any other [municipal] pension or retirement system." Finally, the statute invited the City to approve the changes: "This act shall take effect upon passage and be applicable to the City of Cranston upon the affirmative vote of a majority of the City Council adopting the provisions hereof." The Cranston City Council duly enacted two ordinances so providing, the details of which we discuss in a later section of this opinion.

By 2011, Rhode Island's public employee pension system itself faced dire underfunding, which the state legislature labeled a "fiscal peril" that threatened the ability of Rhode Island's municipalities to provide basic public services. The legislature passed the Rhode Island Retirement Security Act of 2011 (the "2011 Act"), which contained a series of pension reforms designed to bring the state system into financial health. As relevant to the Unions, the 2011 Act added a minimum retirement age of fifty-five where previously none had existed, changed the years of minimum service from twenty to twenty-five, reduced the pension accrual percentage per credited year of service, and made the calculation for workers' final compensation less favorable. These changes applied to future retirees, not those already receiving benefits. The 2011 Act also changed the annual COLA payment from three percent to a variable percentage for current and future pensioners. Overall, the 2011 Act substantially reduced the value of public employee pensions provided by the Rhode Island system.

A variety of municipal employee unions and retiree groups sued the State in the wake of the 2011 Act. Eventually, those unions and groups entered into a class settlement with the State. In return for dismissal of the claims against it, the State in 2015 enacted certain additional amendments to its pension laws

(the "2015 Amendments"). These amendments ameliorated but did not eliminate the changes in the 2011 Act that reduced the value of pensions provided under the state system. A state superior court thereafter entered judgment approving the class settlement. While the Unions' members apparently receive some of the advantages of the 2015 Amendments, they did not participate in the settlement, and their members are not subject to the state court judgment approving the settlement. See R.I. Pub. Emps. Retiree Coal. v. Raimondo, No. PC-2015-1468, 2015 WL 4501873, at *1 (R.I. Super. Ct. July 8, 2015) (final judgment certifying settlement class).

The Unions filed this case in March of 2016 on behalf of current Cranston firefighters and police officers, challenging the curtailment of their future pension benefits. Counts I-III of the complaint train exclusively on the enactment of the 2011 Act, as amended in 2015, as the challenged wrongful conduct. The counts assert that the legislation infringed upon the rights of the Unions' members under the Contracts, Due Process, and Takings Clauses of the United States Constitution. The complaint's factual averments seek to portray the 1996 Special Legislation as a contract between the State and those Cranston firefighters and police officers who joined the state retirement system. The complaint also refers to the Unions' collective bargaining agreements ("CBAs") with the City and to "vested and contractual rights" under two Cranston ordinances. The complaint offers no

hint as to how or even whether the alleged wrongful conduct (enactment of the 2011 Act, as amended in 2015) impaired or took away any rights under the CBAs or the ordinances. Nor do the Unions' briefs on appeal so clarify. Count IV of the complaint is something of a detour. It seeks to challenge a term of a class settlement that prohibits retired Cranston public safety officers (who are not represented by the Unions) "from . . . proposing, supporting, encouraging and/or advocating relief for" the unions in this case.

The district court dismissed (without prejudice) counts I-III to the extent they depended on the assertion that the 1996 Special Legislation was a contract that was unconstitutionally impaired by the amended 2011 Act to the detriment of the Unions' members in violation of the Contracts, Takings, or Due Process Clauses of the United States Constitution. Cranston Firefighters, IAFF Local 1363 v. Raimondo, No. 16-cv-130-ML, 2017 WL 899948, at *10–11 (D.R.I. Mar. 7, 2017). At the same time, the district court apparently viewed that ruling as not eliminating the need to also determine "what, if any, contractual rights the CBAs and Cranston City Ordinances confer[red] on the Plaintiffs." Id. at *9. Determining that the likely resolution of that question in a pending state court proceeding would affect the resolution of this case, the district court abstained under the authority of Railroad Commission of Texas v. Pullman Co., 312

- 8 -

U.S. 496 (1941), and dismissed any claims based on the CBAs or the Cranston ordinances without prejudice.  Cranston Firefighters, 2017 WL 899948, at *9; see Cranston Police Retirees Action Comm. v. City of Cranston, No. KC-2013-1059, 2016 WL 4059309 (R.I. Super. Ct. July 22, 2016).  Finally, the district court dismissed (with prejudice) count IV, finding that the Unions lacked standing to complain about any restrictions assumed by retirees under the class settlement the Unions did not join.  Cranston Firefighters, 2017 WL 899948, at *11-12.  The Unions timely appealed to this court.

## II.

### A.

Because the district court dismissed the Unions' challenge to the amended 2011 Act by granting a motion to dismiss the claim as pleaded, our review is de novo.  LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998).  In conducting this de novo review, we assume all facts pleaded in or reasonably inferred from the complaint to be true.  Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 30 (1st Cir. 2010).

We begin our analysis of the Contracts Clause claim as we have begun such an analysis before in considering whether a state statute constitutes a contract.  "We need not decide whether the statute ever gives rise to a contractual relationship," Parker v. Wakelin, 123 F.3d 1, 9 (1st Cir. 1997); rather, we can assume

- 9 -

without deciding that the 1996 Special Legislation contractually bound the State in some manner to Cranston fire and police members, and ask the narrower, more focused question of whether the State was contractually bound not to make the specific benefit modifications that it made in 2011 and 2015. See Me. Ass'n of Retirees v. Bd. of Trs. of the Me. Pub. Emps. Ret. Sys., 758 F.3d 23, 30 (1st Cir. 2014) ("[W]e assume that MePERS creates some contractual obligation and focus instead on whether COLAs are included in that obligation.").

The modifications at issue here appear on their face to be material. There is no claim, though, that they apply to persons who had already retired at the time they were made (nor do the plaintiff Unions include any retirees). Importantly, there is no allegation that the value of the benefits as modified falls below the value of the respective employees' contributions to the plan. We therefore read the complaint as challenging a reduction in the amount by which the value of the benefit exceeds the value of any contribution by the employees to fund the benefit.

A claim that a state statute creates a contract that binds future legislatures confronts a tropical-force headwind in the form of the "unmistakability doctrine." Parker, 123 F.3d at 5. This doctrine precludes finding that a statute creates a binding contract absent a clear and unequivocal expression of intent by the legislature to so bind itself. Nat'l R.R. Passenger

Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465–66 (1985). The doctrine recognizes that "the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state." Id. at 466. It also serves "the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power." United States v. Winstar Corp., 518 U.S. 839, 875 (1996) (plurality opinion).

Never once has our court found that state or federal legislation clearly and unequivocally expressed a legislative intent to create private contractual rights enforceable as such against the state. Our discussion in Parker best demonstrates how difficult it is to satisfy this standard in the absence of plain language that the legislature regarded its handiwork as creating a binding, contractual commitment. The Maine statute creating a retirement benefit for public school teachers included a clause stating that "no amendment . . . may cause any reduction in the amount of benefits which would be due a member . . . on the date immediately preceding the effective date of the amendment." Parker, 123 F.3d at 8 (ellipses in original). We recognized that one could well read that clause as creating contract rights for a teacher who was in active service long enough to be "vested," i.e., "due" benefits to be paid in the future. Id. at 9. Nevertheless,

- 11 -

we also recognized that one might also construe the word "due" as describing only benefits that were "currently payable."  Id. at 8.  That ambiguity inherent in the conflicting plausible readings meant that the statutory text furnished no unmistakable contractual undertaking.  Id. at 9.

Similarly, in NEA, the legislature actually labeled, in a heading, the requisite statutory pension benefit a "Guaranty by state -- Annual appropriations" and provided that the legislature "shall make annual appropriations which shall be sufficient to provide for the payment of . . . benefits . . . required of the state."  172 F. 3d at 28.  Nevertheless, we found that language to fall "at least a step short of clearly expressing a contractual commitment not to change benefit levels or other plan variables by legislation."  Id.

The quite plausible but nevertheless not unmistakable textual commitments that we found to be insufficient in Parker and NEA contrast with the unambiguous text found sufficient by the United States Supreme Court in two cases upon which the parties rely.  In Indiana ex rel. Anderson v. Brand, the statutory benefit was literally "couched in terms of contract."  303 U.S. 95, 105 (1938).  And in U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1 (1977), the intent to contract appeared equally plainly.  The legislation expressly stated that New York and New Jersey "covenant and agree with each other and with the holders of any affected

- 12 -

bonds" that the Port Authority would not "apply any of the . . . revenues or reserves . . . pledged in whole or in part as security for such bonds, for any railroad purposes whatsoever other than permitted purposes hereinafter set forth."  Id. at 9-10.

In the 1996 Special Legislation at issue here, there is no language that comes remotely close to that found sufficient in U.S. Trust or Brand.  We do not even have language that goes as far as the language found insufficient in Parker and NEA.  Bereft of language couched in the terms of contract, or of express statements of an intent to create a contract, the Unions point to the statute's clause requiring that those then-current Cranston employees joining the system who had "accrued rights and benefits" under the Cranston plan were required to "waive and renounce[]" those rights and benefits, and that all Cranston participants must contribute ten percent of their pay.  These terms, say the Unions, show that "both sides gave something up, and both sides received something in return."  Hence there was a "bargained-for exchange of binding rights."

The conclusory allegation that the state "received something in return" could be made of every pension program in which there is a contribution requirement (such as federal Social Security).  In NEA, for example, the state received payments from joining members who wished to "purchase credit" for years of service, 172 F.3d at 24, yet we found the state free to repeal the

value of the benefits in excess of the payments made, id. at 30-31. We observe, too, that the rights Union members "gave up" were rights against what they themselves viewed as a "critically underfunded" municipal plan by a city on the edge of financial failure, and not rights against the State. Moreover, the Unions tell us that their retirement benefits are a mandatory subject of collective bargaining under state law, and that they have renegotiated their CBAs with the City of Cranston multiple times since 1996, requiring the City to reaffirm its commitment to substantially the same benefit provisions each time. This suggests both the limited scope of any waiver of ongoing rights against the cash-strapped municipality and the perception of some risk that the State itself might decide to reduce the benefits that it provides, since the Unions appear to have sought the City's commitment as a potential backstop.

Our case law does leave open for future consideration the possibility that the mere creation of a retirement plan to which members contribute a portion of their own pay clearly and unequivocally creates a contractual commitment requiring the state to repay member contributions and, perhaps, reasonable interest. See NEA, 172 F.3d at 31; see also Me. Ass'n of Retirees, 758 F.3d at 30. The plan at issue in this case, though, is a hybrid defined benefit and defined contribution plan and there is no allegation, nor any argument either below or on appeal, that the modifications

at issue leave or even might leave in place a benefit worth less than the present value of the contributions. So even if we were to place some weight on the "give something/get something" argument, that weight would have no logical bearing on whether the state clearly and unequivocally precluded itself from modifying the pension scheme in the manner in which it has done so here.

Finding no clear markers of a contractual commitment in the statutory text, the Unions argue that the circumstances surrounding the passage of the 1996 Special Legislation supply enough evidence of legislative intent to bind the State notwithstanding the conclusion we would otherwise reach based on the text alone. It is certainly true that courts have looked at circumstances surrounding a law's enactment in the course of determining whether the statute creates a constitutionally-protected contractual entitlement. In all such United States Supreme Court cases (and there are no such First Circuit cases), however, reference to such circumstances served to reinforce a conclusion already made quite clear by the statute's express language. Thus, in U.S. Trust, the circumstances precipitating the bondholder-protection statute's enactment, including a legislative committee's recommendation for legislative text referencing Contracts Clause protections, reinforced the straightforward reading of the text, which itself spoke plainly of the state's intent to "covenant and agree." 431 U.S. at 9-10.

- 15 -

And in Brand, the finding that the teacher-tenure legislation, which used language like, "such contract shall be deemed to continue in effect for an indefinite period and shall be known as an indefinite contract," 303 U.S. at 101 n.14, created a contractual commitment was supported by circumstances leading up to the law's passage in which teachers possessed no guarantees as to their future employment, even after years of service, 303 U.S. at 104.

And even if we were to accept in theory the possibility that extra-textual circumstances by their own might carry the day for the Unions, the circumstances in this case do not provide unequivocal support for the Unions' reading of the 1996 Special Legislation. For starters, because Rhode Island does not record legislative history, the Unions have an uphill battle explaining how the "legislature as a whole," Parker, 123 F.3d at 9, was even aware of any particular circumstance to which the Unions point. All the Unions manage to allege is that "[r]epresentatives of the City testified before the Senate and House of Representatives in support of the special legislation."

Even if we were to ignore this gap, we would find the circumstances themselves to be incapable of serving as the required clear and unequivocal evidence of intent. The principal circumstance to which the Unions point is the fact that, like a party to a contract, they "negotiate[d]" the benefit levels

- 16 -

described in the 1996 Special Legislation.  This, though, strikes us as nothing more than saying that the Unions lobbied for the legislation, much like an interest group might lobby to increase Medicare or Social Security benefits.

There are other important relevant circumstances, too, that cut strongly against the Unions' reading.  Just two years before passing the 1996 Special Legislation, the Rhode Island legislature expressly repealed a prior legislative grant of state pension benefits (described in a different section of the state pension regime) to employees of teachers' unions, and returned member contributions with interest.  See NEA, 172 F.3d at 24–25.  Additionally, the legislature had several times amended the very pension system at issue here, increasing the minimum years of service requirement in 1975, 1975 R.I. Pub. Laws Ch. 153, and raising the mandatory retirement age in 1984, 1984 R.I. Pub. Laws Ch. 13.  Given that history, one can hardly say that the 1996 legislature necessarily assumed that a new grant of enhanced benefits could not also be modified at a later date.  Nor can one say that any observer of the State's conduct could reasonably assume that state pension legislation was a one-way ratchet.

We therefore agree with the district court that, as a matter of law, the 1996 Special Legislation did not constitute a constitutionally binding commitment precluding Rhode Island from making the 2011 and 2015 modifications to the pension plan in which

the Unions' members were participants. The lack of any allegation that the current benefits provided by the State fall below the present value of the contributions made by the Union pensioners, coupled with the absence of the alleged contract, also eliminates the basis for a claim under the Takings Clause. See NEA, 172 F.3d at 30. And the use of legislation that is not otherwise constitutionally infirm to reduce a non-mandatory benefit does not violate due process. Hoffman v. City of Warwick, 909 F.2d 608, 619-20 (1st Cir. 1990). We therefore affirm the dismissal of counts I-III predicated upon any claim that because of the 1996 Special Legislation, the State could not make the modifications made in the 2011 Act and 2015 Amendments.

## B.

Having disposed of the Unions' claim against the State that the amended 2011 Act impaired a contractual commitment made in the 1996 Special Legislation, we turn to the Unions' arguments that we should vacate the district court's decision to dismiss their claims involving the City. In their briefs on appeal, the Unions never actually say what those claims are, and it remains a mystery to us. The Unions describe this lawsuit as seeking "a declaratory judgment that the [2011 Act, as amended] violated the [U.S. Constitution]." In the complaint's summary statement of the pleaded counts, the only alleged wrongful conduct is the enactment of the amended 2011 Act. The City, though, did not enact the 2011

Act or the 2015 Amendments.  And because the Unions fail to explain how the actions of a third party, the State, operate to impair the purported contractual obligations promised by the City in its ordinances and in the CBAs, there is no developed claim that the amended 2011 Act impairs any asserted contract other than the 1996 Special Legislation.

The complaint does allege that certain Cranston ordinances and the CBAs between the City and the Unions created "vested and contractual rights" in favor of the Unions' members. It further alleges, without specificity, that the City is violating its ordinances "on information and belief."  If these allegations are correct, then perhaps the Unions and their members have claims under state law for breach of contract, or for violating the ordinances.  And, indeed, the Unions tell us that they have filed arbitrable grievances against the City for violating the terms of the CBAs.

The district court apparently gleaned from all of this, with the City's acquiescence, a claim (or rather, an assertion) "that the [Unions' members] have contractual and otherwise constitutionally protected rights to certain retirement benefits pursuant to various CBAs, sections of the Cranston Code of Ordinances, and/or R.I. Gen. Laws § 45-21.2-1."  Pointing to ongoing state court litigation brought by retired Cranston firefighters and police officers challenging specific actions by

the City related to benefits described in its ordinances and CBAs, the district court invoked Pullman abstention and dismissed without prejudice all claims dependent upon City-guaranteed contract rights, figuring that the state courts might provide answers that would assist in resolving those claims. The Unions ask that we set aside that ruling.

Without any developed explanation by the Unions of what the City has done that violates or threatens an imminent violation of federal law, we can find no coherent basis for litigating any claims against the City in this federal case. If the City has violated the CBAs, then presumably the arbitrator hearing the pending grievances will so rule. And if the City is violating its own ordinances, those ostensible state law claims can be heard in state court. More importantly, there is no independent jurisdictional basis upon which the district court might hear such state law claims between non-diverse parties. And to the extent that supplemental jurisdiction might have otherwise attached to the Unions' undeveloped claims against the City, the early dismissal of the federal claims -- which we now affirm -- generally calls for a refusal to continue exercising jurisdiction over any supplemental claims. Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). In this case we see no reason that would allow a district court to depart from that general rule. To the contrary, the district court's perception that the state courts

should speak first on state issues raised even as part of the federal claims applies a fortiori when there remain no federal claims. For this alternative reason, and without addressing the question of Pullman abstention, we affirm the dismissal without prejudice of any claims against the City.

## C.

We turn, finally, to the Unions' request that the district court declare that retired Cranston police and firefighters are not bound to comply with a provision of the class settlement approved and implemented by the Rhode Island state court. The Unions do not claim to represent any of the retirees. The Unions nevertheless claim standing to challenge the lawfulness and enforceability of the state judgment implementing the class settlement agreement because the judgment "prevents Cranston Retirees from presenting the testimony of Cranston retirees, which is extremely relevant to the [Unions'] claims" in this case.

We see all sorts of potential problems with this claim, from a likely lack of cognizable standing, to the retirees' apparent decision not to challenge the settlement or the judgment approving and implementing the settlement, to an unsupported assumption that A has an ability to prevent B and C from agreeing that they won't talk to A, or to the fact that nothing in the class settlement agreement appears to prevent anyone from testifying in response to a subpoena. The simple answer, though, is that given

our disposition of the substantive claims in the Unions' complaint, the Unions are unable to point to any plausibly relevant testimony that retirees might offer that would materially alter the result in this case.  Therefore we affirm the dismissal of count IV.

### III.

For the reasons described above, we affirm the dismissal of this complaint.